**No. 25-2830**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CINDY CODONI, MICHELE GEER, HORACE CATHCART, AMY FRANCE, AND
TAMARA CHAKOS, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

*Appellees*,

*v.*

PORT OF SEATTLE, ALASKA AIR GROUP, INC., AND DELTA AIR LINES, INC.,

*Appellants*.

On Appeal From The United States District Court
For The Western District Of Washington
No. 2:23-cv-795-JNW (Hon. Jamal N. Whitehead)

### APPELLANT DELTA AIR LINES, INC.'S OPENING BRIEF

David Balser
Paul J. Watford
David Willingham
Arwen R. Johnson
Madison H. Kitchens
Kelly Perigoe
KING & SPALDING LLP
11180 Peachtree St., NE
Atlanta, GA 30309
(404) 572-4600

Daniel W. Nelson
Amir C. Tayrani
Stacie Fletcher
Jessica L. Wagner
Joseph Edmonds
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Attorneys for Appellant Delta Air Lines, Inc.*

*(additional counsel on inside cover)*

Malaika M. Eaton
Gregory J. Hollon
MCNAUL EBEL NAWROT &
HELGREN PLLC
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816

*Attorneys for Appellant
Delta Air Lines, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellant Delta Air Lines, Inc. states that it is a publicly held corporation that has no parent corporation.  No publicly held corporation owns 10% or more of Delta Air Lines, Inc.'s stock.  The Vanguard Group, Inc. owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

ORAL ARGUMENT STATEMENT ........................................... xiv

INTRODUCTION ............................................................ 1

JURISDICTIONAL STATEMENT ......................................... 3

STATEMENT OF ISSUES .................................................. 4

CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED ........................................... 4

STATEMENT OF THE CASE .............................................. 5

    I.    The Federal Government Pervasively Regulates Aircraft Operations, Flight Paths, And Emissions ............................................................ 5

    II.    Factual And Procedural Background .................................... 14

SUMMARY OF ARGUMENT .................................................. 20

STANDARD OF REVIEW .................................................. 23

ARGUMENT .................................................................. 24

    I.    The District Court Should Have Dismissed Plaintiffs' Claims Because They Constitute A Collateral Challenge To FAA And EPA Orders That Needed To Be Brought In A Court of Appeals. ................................................................. 24

        A.    Plaintiffs' Suit Is A Collateral Attack On The Governing FAA And EPA Orders. ......................... 26

B.    The District Court Erred By Declining To Apply The Collateral-Attack Doctrine. ......................... 31

II.    Plaintiffs' Claims Are Preempted By Federal Law ............. 35

A.    Federal Law Expressly Preempts Plaintiffs' Claims. ................................................................. 37

1.    The ADA Preempts Plaintiffs' Claims. .............. 37

2.    The CAA Preempts Plaintiffs' Claims. .............. 49

B.    Plaintiffs' Claims Are Foreclosed By Field Preemption. ............................................................. 54

1.    Congress Has Given Exclusive Authority To The FAA To Regulate Airspace Management. ....................................... 56

2.    Plaintiffs' Claims Fall Squarely Within The Federally Occupied Field Of Airspace Management And Are Therefore Preempted. .......................................... 61

3.    The District Court Erred By Rejecting Field Preemption. .......................................... 63

C.    Plaintiffs' Claims Are Barred By Conflict Preemption. ............................................................. 67

CONCLUSION ............................................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Transp. Ass'n of Am. v. City & County of San Francisco*,
 266 F.3d 1064 (9th Cir. 2001) ................................................................ 46

*Am. Airlines, Inc. v. Wolens*,
 513 U.S. 219 (1995) ..................................................................... 39, 43

*Am. Trucking Ass'ns, Inc. v. Los Angeles*,
 660 F.3d 384 (9th Cir. 2011) ............................................................... 44

*Americopters, LLC v. FAA*,
 441 F.3d 726 (9th Cir. 2006) ............................................................... 33

*Arizona v. United States*,
 567 U.S. 387 (2012) ............................................... 54, 55, 64, 67, 68

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .......................................................................... 54

*Bank of Am. v. City & County of San Francisco*,
 309 F.3d 551 (9th Cir. 2002) ............................................................... 24

*Bennett v. United States*,
 44 F.4th 929 (9th Cir. 2022) ............................................................... 23

*Bryski v. City of Chicago*,
 499 N.E.2d 162 (Ill. Ct. App. 1986) .................................................... 59

*Cal. Dump Truck Owners Ass'n v. Nichols*,
 784 F.3d 500 (9th Cir. 2015) ............................................................... 28

*California v. Dep't of Navy*,
 431 F. Supp. 1271 (N.D. Cal. 1977) ............................... 52, 53, 54, 67

*California v. Dep't of Navy*,
 624 F.2d 885 (9th Cir. 1980) .............................. 22, 51, 52, 53, 67

*Chamber of Commerce of U.S. v. Whiting*,
   563 U.S. 582 (2011) ................................................................ 68

*Charas v. Trans World Airlines, Inc.*,
   160 F.3d 1259 (9th Cir. 1998) ........................................ 38, 39, 42, 48

*City of Burbank v. Lockheed Air Terminal Inc.*,
   411 U.S. 624 (1973) ..................................... 1, 2, 22, 56, 58, 60, 62, 64

*City of New York v. FCC*,
   486 U.S. 57 (1988) ................................................................ 67

*Cohen v. Apple Inc.*,
   46 F.4th 1012 (9th Cir. 2022) ...................................................... 69, 71

*Corber v. Xanodyne Pharms., Inc.*,
   771 F.3d 1218 (9th Cir. 2014) ...................................................... 31

*Crist v. Leippe*,
   138 F.3d 801 (9th Cir. 1998) ...................................................... 29, 33

*Dilts v. Penske Logistics, LLC*,
   769 F.3d 637 (9th Cir. 2014) ...................................................... 44, 46

*Duncan v. Bonta*,
   133 F.4th 852 (9th Cir. 2025) ...................................................... 66

*Exxon Corp. v. City of New York*,
   548 F.2d 1088 (2d Cir. 1977) ...................................................... 50

*French v. Pan Am Exp., Inc.*,
   869 F.2d 1 (1st Cir. 1989) ...................................................... 59, 60

*Fudge v. Delta Air Lines, Inc.*,
   753 F. Supp. 3d 987 (C.D. Cal. 2024) ............................................ 40

*Gilmore v. Gonzales*,
   435 F.3d 1125 (9th Cir. 2006) ...................................................... 25, 34

*Ginsberg v. Nw., Inc.*,
   695 F.3d 873 (9th Cir. 2012) ...................................................... 39

*Green v. Brantley,*
    981 F.2d 514 (11th Cir. 1993)............................................................ 33

*Growers, Inc. v. Foremost Pump & Well Servs., LLC,*
    506 P.3d 705 (Wash. App. 2022)........................................................ 18

*Grundy v. Thurston County,*
    117 P.3d 1089 (Wash. 2005) .............................................................. 17

*Martin ex rel. Heckman v. Midwest Express Holdings, Inc.,*
    555 F.3d 806 (9th Cir. 2009)................................................... 59, 61, 62

*In re Korean Air Lines Co., Ltd., Antitrust Litig.,*
    642 F.3d 685 (9th Cir. 2011)......................................................... 37, 40

*Krauss v. FAA,*
    2016 WL 1162028 (N.D. Cal. Mar. 24, 2016)......................... 29, 33, 34

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012) ............................................................................ 63

*Law v. Gen. Motors Corp.,*
    114 F.3d 908 (9th Cir. 1997)........................................................ 48, 63

*Mace v. Skinner,*
    34 F.3d 854 (9th Cir. 1994)................................................................ 34

*Mack v. S. Bay Beer Distrib., Inc.,*
    798 F.2d 1279 (9th Cir. 1986)............................................................ 10

*Magassa v. Mayorkas,*
    52 F.4th 1156 (9th Cir. 2022) ............................................................ 25

*McKay v. City & County of San Francisco,*
    2016 WL 7425927 (N.D. Cal. Dec. 23, 2016).................... 27, 29, 32, 34

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,*
    606 U.S. 146 (2025) ...................................................................... 25, 26

*Miller v. C.H. Robinson Worldwide, Inc.,*
    976 F.3d 1016 (9th Cir. 2020)........................................... 44, 45, 46, 47

*Mills v. Orcas Power & Light Co.*,
    355 P.2d 781 (Wash. 1960) ................................................................ 18

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ........................... 35, 36, 37, 55, 57, 60, 61

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................ 38, 41, 48

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) ........................................................ 36, 68, 69, 70

*Nacarino v. Kashi Co.*,
    77 F.4th 1201 (9th Cir. 2023) ........................................................... 62

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
    813 F.3d 718 (9th Cir. 2016) ...................................... 35, 37, 55, 57, 65

*Nat'l Helicopter Corp. of Am. v. City of New York*,
    137 F.3d 81 (2d Cir. 1998) ................................................................ 59

*New England Legal Found. v. Costle*,
    666 F.2d 30 (2d Cir. 1981) ................................................................ 28

*Nw. Airlines, Inc. v. Minnesota*,
    322 U.S. 292 (1944) ........................................................................... 1

*Nw., Inc. v. Ginsberg*,
    572 U.S. 273 (2014) .................................................... 35, 39, 40, 43, 45

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011) .................................................................... 68, 69

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016) .......................................................................... 37

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008) .................................................................... 47, 63

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) .................................................................... 45, 48

*San Diego Bldg. Trades Council v. Garmon*,
    359 U.S. 236 (1959) ....................................................................... 47, 63

*San Diego Unified Port Dist. v. Gianturco*,
    651 F.2d 1306 (9th Cir. 1981) ............................................ 22, 59, 62, 64

*Skysign Int'l, Inc. v. City & County of Honolulu*,
    276 F.3d 1109 (9th Cir. 2002) ............................................................. 59

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*,
    295 F.3d 918 (9th Cir. 2002) ............................................................... 10

*Tur v. FAA*,
    104 F.3d 290 (9th Cir. 1997) ........................ 4, 20, 24, 25, 30, 31, 32, 35

*United Airlines, Inc. v. Mesa Airlines, Inc.*,
    219 F.3d 605 (7th Cir. 2000) ............................................................... 40

*United States v. Christensen*,
    419 F.2d 1401 (9th Cir. 1969) ............................................................. 57

*United States v. City of Blue Ash*,
    487 F. Supp. 135 (S.D. Ohio 1978) ...................................................... 60

*United States v. Locke*,
    529 U.S. 89 (2000) .............................................................................. 36

*Ventress v. Japan Airlines*,
    603 F.3d 676 (9th Cir. 2010) ............................................................... 48

*Ventress v. Japan Airlines*,
    747 F.3d 716 (9th Cir. 2014) .......................................................... 60, 62

*Virginia v. United States*,
    74 F.3d 517 (4th Cir. 1996) ................................................................ 28

*Washington v. Gen. Motors Corp.*,
    406 U.S. 109 (1972) ............................................................................ 66

*Witty v. Delta Air Lines, Inc.*,
    366 F.3d 380 (5th Cir. 2004) ............................................................... 40

*Wolens v. Am. Airlines, Inc.*,
  626 N.E.2d 205 (Ill. 1993) ..................................................... 39

**Constitutional Provisions**

U.S. Const. art. IV, cl. 2 .......................................................... 35

**Statutes**

5 U.S.C. § 553 ........................................................................ 30

28 U.S.C. § 1331 ...................................................................... 3

28 U.S.C. § 1332 ...................................................................... 3

28 U.S.C. § 1442 ...................................................................... 3

42 U.S.C. § 2210 ...................................................................... 3

42 U.S.C. § 4321 ...................................................................... 9

42 U.S.C. § 7412 .................................................................... 51

42 U.S.C. § 7543 .................................................................... 50

42 U.S.C. § 7571 .............................................. 5, 13, 49, 51, 66, 70

42 U.S.C. § 7572 ............................................................. 13, 66

42 U.S.C. § 7573 ....................................................... 2, 4, 22, 49

42 U.S.C. § 7607 ............................................................. 20, 25

49 U.S.C. § 14501 ............................................................ 44, 70

49 U.S.C. § 40102 .................................................................... 5

49 U.S.C. § 40103 ........................................................... 1, 5, 56

49 U.S.C. § 41713 ...................................................... 2, 4, 21, 38, 39

49 U.S.C. § 44701 ......................................................... 5, 11, 70

49 U.S.C. § 44702 .................................................................. 66

49 U.S.C. § 44704................................................................12, 66

49 U.S.C. § 44714................................................................12, 66

49 U.S.C. § 46110.........................................................20, 24, 25

Pub. L. No. 101-549, § 233, 104 Stat. 2399 (1990)....................51

**Rules**

Fed. R. App. P. 5 ............................................................................3

Fed. R. Evid. 201........................................................................10

**Regulatory and Administrative Authorities**

14 C.F.R. Part 21 ....................................................................12, 66

14 C.F.R. Part 23 ..........................................................................12

14 C.F.R. Part 24 ..........................................................................12

14 C.F.R. Part 25 ....................................................................11, 12

14 C.F.R. Part 26 ....................................................................11, 12

14 C.F.R. Part 33 ..........................................................................11

14 C.F.R. Part 34 ...........................................................11, 13, 28, 49

14 C.F.R. Part 43 ..........................................................................13

14 C.F.R. Part 71 ............................................................................5

14 C.F.R. Part 77 ............................................................................9

14 C.F.R. Part 91 .............................................................5, 6, 8, 9, 58

14 C.F.R. Part 91 ............................................................................5

14 C.F.R. Part 92 ............................................................................5

14 C.F.R. Part 93 ............................................................................5

14 C.F.R. Part 94 ................................................................................... 5

14 C.F.R. Part 95 ................................................................................... 5

14 C.F.R. Part 96 ................................................................................... 5

14 C.F.R. Part 97 ...............................................................................5, 6

14 C.F.R. Part 121 ..............................................................6, 9, 12, 13

14 C.F.R. Part 125 ............................................................................... 12

14 C.F.R. Part 150 ................................................................................. 9

14 C.F.R. Part 151 ................................................................................. 9

14 C.F.R. Part 152 ................................................................................. 9

14 C.F.R. Part 153 ................................................................................. 9

14 C.F.R. Part 154 ................................................................................. 9

14 C.F.R. Part 155 ................................................................................. 9

14 C.F.R. Part 156 ................................................................................. 9

14 C.F.R. Part 157 ................................................................................. 9

14 C.F.R. Part 158 ................................................................................. 9

14 C.F.R. Part 159 ................................................................................. 9

14 C.F.R. Part 160 ................................................................................. 9

14 C.F.R. Part 161 ................................................................................. 9

14 C.F.R. Part 162 ................................................................................. 9

14 C.F.R. Part 163 ................................................................................. 9

14 C.F.R. Part 164 ................................................................................. 9

14 C.F.R. Part 165 ................................................................................. 9

14 C.F.R. Part 166 .................................................................. 9

14 C.F.R. Part 167 .................................................................. 9

14 C.F.R. Part 168 .................................................................. 9

14 C.F.R. Part 169 .................................................................. 9

40 C.F.R. Part 63 .................................................................. 51

40 C.F.R. Part 1031 ................................................. 13, 28, 49

EPA, Control of Air Pollution from Aircraft Engines: Emis-
    sion Standards and Test Procedures,
    87 Fed. Reg. 72,312 (Nov. 23, 2022) ........................... 14, 28, 50, 66, 71

EPA, National Emission Standards for Hazardous Air Pollu-
    tants: Engine Test Cells/Stands Residual Risk and Tech-
    nology Review, 85 Fed. Reg. 34,326 (June 3, 2020) ......................... 51

FAA, Documented CatEx, Sea-Tac International Arrivals
    Facility (Apr. 22, 2015) .......................................................... 11

FAA, Finding of No Significant Impact (FONSI) & Record of
    Decision (ROD) for the Implementation of RNAV/RNP
    Procedures at Seattle-Tacoma International Airport
    (Oct. 31, 2012) ........................................... 7, 8, 26, 27, 57

FAA, Order 1050.1F (July 16, 2015) ........................................ 9

FAA, Order 1050.1G (June 30, 2025) .................................... 9, 10

FAA, Order 8130.2K (Aug. 28, 2024) ...................................... 13

FAA, Order JO 7110.65BB (Feb. 20, 2025) .......................... 8, 26

FAA, Record of Decision for the Master Plan Update
    Development Actions Sea-Tac International Airport,
    Seattle, Washington (July 3, 1997) ........................... 10, 27, 57

FAA, Terminal Procedures Publication,
Northwest (Aug. 7, 2025) ..................................................... 6, 7, 26, 58

## Other Authorities

Convention on International Civil Aviation, 4 Apr. 1947, 15
U.N.T.S. 296 ......................................................................... 71

Port of Seattle, Sustainable Airport Master Plan,
https://www.portseattle.org/plans/sustainable-airport-
master-plan-samp ................................................................ 30

## ORAL ARGUMENT STATEMENT

This case would benefit from expanded oral argument time. The case involves weighty issues with nationwide significance—whether airlines and airport operators can be held liable under state tort law for emissions from the ordinary operation of aircraft taking off and landing at airports. This appeal concerns aircraft emissions around Seattle-Tacoma International Airport, but Plaintiffs' theory of liability could be replicated at airports across the country. There are multiple questions of jurisdiction and preemption raised by the appeal, and multiple parties represented by different counsel participating in the appeal, including, on Appellants' side alone, Delta Air Lines, Inc., Alaska Air Group, Inc., and the Port of Seattle, along with *amici*. Accordingly, counsel respectfully proposes 30 minutes of argument per side.

## INTRODUCTION

This is a putative class action that challenges ordinary flight operations at Seattle Tacoma International Airport ("Sea-Tac"). The plaintiffs, on behalf of themselves and putative classes of all residents and property owners within a five-mile radius of Sea-Tac, seek state-law tort damages against two major airlines and the operator of Sea-Tac because the flight paths and altitudes used during take-off and landing allegedly result in emissions onto their properties.

Under well-settled jurisdictional and preemption principles, the district court should have dismissed this action. The federal government has "exclusive sovereignty of airspace of the United States," 49 U.S.C. § 40103(a)(1), and aircraft therefore "move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands," *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633-34 (1973) (quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring)). As relevant to this case, the flight paths and altitudes used during take-off and landing at Sea-Tac are dictated by the Federal Aviation Administration ("FAA"), and aircraft design and emissions levels are perva-

sively regulated by both the FAA and the Environmental Protection Agency ("EPA"). Plaintiffs do not allege that Defendants have violated *any* of the myriad federal laws and regulations governing flight paths, aircraft design, and emissions. They instead seek to hold Defendants liable under state law for actions that the federal government has either mandated or specifically approved.

Plaintiffs' suit is doubly barred. The district court lacked subject-matter jurisdiction over this action because it is an improper collateral attack upon the federal regulations that govern every aspect of the conduct that Plaintiffs challenge—namely, the flight paths, altitudes, and emissions of aircraft arriving at and departing from Sea-Tac. Those regulations must be challenged by filing a petition for review in a federal court of appeals from the agency's decision adopting them. Moreover, Plaintiffs' claims are preempted by the same federal laws and regulations. The claims are expressly preempted by the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713, and Clean Air Act ("CAA"), 42 U.S.C. § 7573, and they are also barred by field and conflict preemption, given the "pervasive nature of the scheme of federal regulation" governing aircraft operations, *City of Burbank*, 411 U.S. at 633. Because Plaintiffs'

complaint is both jurisdictionally barred and preempted, the Court should reverse the district court and order that Plaintiffs' complaint be dismissed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d); the Price-Anderson Act, 42 U.S.C. § 2210(n)(2); 28 U.S.C. § 1331; and the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See* ER-8-11 (finding jurisdiction proper under CAFA).[1] Because the district court certified its decision for review under 28 U.S.C. § 1292(b) on February 18, 2025; Defendants timely petitioned this Court to accept certification on February 28, 2025; and the Court granted the petition; the Court has jurisdiction to review the district court's order denying Defendants' motions to dismiss. *See Codoni v. Port of Seattle*, No. 25-1293, Dkt. 16 (9th Cir. May 1, 2025) (granting § 1292(b) petition); Fed. R. App. P. 5(d).

---

[1] While jurisdiction is otherwise proper under these statutory authorities, Plaintiffs' claims constitute an improper collateral attack on FAA and EPA orders and regulations as to which exclusive jurisdiction resides in this Court or the D.C. Circuit. *See infra* pp. 24-35.

## STATEMENT OF ISSUES

1.     Whether state-law claims seeking to impose tort liability for purported injury from federally regulated aviation operations are barred by the collateral-attack doctrine because such claims are "inescapably intertwined" with the federal agency orders and regulations setting flight paths and aircraft design and emissions standards. *Tur v. FAA*, 104 F.3d 290, 292 (9th Cir. 1997).

2.     Whether state-law claims seeking to impose tort liability for purported injury from federally regulated aviation operations (A) are expressly preempted under the Airline Deregulation Act, 49 U.S.C. § 41713, because they "relat[e] to" the airlines' "route[s]" and "service[s]," or under the Clean Air Act, 42 U.S.C. § 7573, because they seek to impose emissions standards not identical to federal law; or (B) are foreclosed by field or conflict preemption given the pervasive federal regulation of airspace management, aviation safety, and aircraft design and emissions.

## STATUTORY AND REGULATORY
## PROVISIONS INVOLVED

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.  The Federal Government Pervasively Regulates Aircraft Operations, Flight Paths, And Emissions.

Consistent with the United States' "exclusive sovereignty" over "airspace of the United States," 49 U.S.C. § 40103(a)(1), including the "airspace needed to ensure safety in the takeoff and landing of aircraft," *id.* § 40102(a)(32), Congress has authorized the FAA to establish regulations to "protec[t] individuals and property on the ground," "ensure the safety of aircraft," and "preven[t] collision[s]," *id.* § 40103(b)(1)-(2).  The FAA must also regulate aircraft design and aircraft engines "in the interest of safety."  *Id.* § 44701(a)(1).  And Congress authorized the EPA, in consultation with the FAA, to establish aircraft emissions standards to reduce "air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7571(a)(2)(A)-(B).  Together, the FAA and EPA have promulgated thousands of regulations and orders implementing these directives.

*Flight Paths.*  The FAA and its air traffic controllers dictate the flight paths that aircraft must take, including the altitude, direction, and angles for takeoff and landing.  *E.g.*, 14 C.F.R. Part 71 (designating air traffic service routes); *id.* Parts 91-97 (providing air traffic operating

rules); *id.* §§ 91.153-.183 (providing detailed rules regarding flight path, altitude, and takeoff and landing for various types of flights); *id.* §§ 121.91-.107, 121.555 (governing routes for commercial air carriers); *id.* § 121.189 (setting takeoff requirements for air carriers); *id.* §§ 121.657-.661 (specifying flight altitudes for air carriers).

The FAA, through regulations and orders, prescribes "standard instrument approach procedures and takeoff minimums and obstacle departure procedures" for all aspects of takeoff and landing. 14 C.F.R. § 97.20(a). "No person may make an instrument approach at an airport except in accordance" with these specifications. *Id.* § 121.567. The FAA publishes "aeronautical charts" with these approach and departure procedures for every regulated airport in the country. *Id.* § 97.20(c).

For aircraft arriving at or departing from Sea-Tac, the FAA sets detailed flight paths with specific rates of descent or ascent at specific altitudes. *See* FAA, Terminal Procedures Publication, Northwest Z7-Z8, Z13-Z33, Z36, 730-78 (Aug. 7, 2025) (compiling procedures and charts for Sea-Tac).[2] For example, for a standard landing at Sea-Tac, the FAA requires air carriers to approach at a specific, gradual angle of descent that

---

[2] https://aeronav.faa.gov/upload_313-d/terminal/2025-08-07/NW1.pdf.

6

brings airplanes to 1,900 feet of altitude five miles (4.4 NM) from the runway. *Id.* at 730 (bottom left chart); *see id.* at F1 (legend for interpreting glide path charts).

### Example of a Sea-Tac Landing Path



*FAA, Terminal Procedures Publication, Northwest at 730.*

The FAA set the "routes and procedures" for Sea-Tac after carefully analyzing their environmental and safety impacts, including on "persons and property on the ground." FAA, Finding of No Significant Impact (FONSI) & Record of Decision (ROD) for the Implementation of RNAV/RNP Procedures at Seattle-Tacoma International Airport 1-2

(Oct. 31, 2012) ("Greener Skies FONSI").[3]  In a project named Greener Skies Over Seattle, the FAA implemented new "air traffic routes and instrument procedures" adopting the "latest navigational technologies" that "allow aircraft operators to fly optimal descent paths, while reducing their environmental impact."  *Id.* at 2-3.  The resulting flight paths begin 40 to 140 miles from Sea-Tac and were designed to minimize fuel burn and reduce emissions.  *Id.* at 3.

Aircraft approaching or departing Sea-Tac must follow the directions of the FAA's air traffic controllers as to which of the FAA-approved routes to take in or out of Sea-Tac and any modifications of those orders depending on weather patterns and flight traffic.  14 C.F.R. § 91.123(b). Air traffic controllers direct altitude levels and speed, have primary responsibility for operations conducted on runways, and oversee ground operations as necessary for safety purposes.  *See* FAA, Order JO 7110.65BB (Feb. 20, 2025).[4]  "[N]o person may operate an aircraft contrary to an [Air

---

[3] https://www.faa.gov/sites/faa.gov/files/air_traffic/environmental_issu es/ared_documentation/ea_SEA_GreenerSkies_Vol1_FONSI_ROD_ 121030.pdf.

[4] https://www.faa.gov/documentLibrary/media/Order/7110.65BB_ Basic_dtd_2-20-25.pdf.

Traffic Control] instruction in an area in which air traffic control is exercised." 14 C.F.R. § 91.123(b).

**Airport Operations.** Before any airplane takes off or lands, the FAA reviews and approves the airport's location, design, and construction, the siting and direction of its runways, and any expansions. *See* 14 C.F.R. Parts 150-169 (specifications for airport planning and construction); *id.* Part 77 (notification and construction limitations on areas near airports); *id.* § 121.590 (requiring the FAA to certify airports before commercial planes use them).

This approval process includes FAA evaluation of the environmental impacts of the airport's use and operation. *See* National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; FAA, Order 1050.1G §§ 1.5(c), 2.1 (June 30, 2025) (implementing statutory mandate for FAA to evaluate environmental impacts before approving the siting of a new commercial airport, new runway, or major runway extension).[5] In par-

---

[5] https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050 .1G.pdf. The district court appropriately took judicial notice of the predecessor version of this order (FAA, Order 1050.1F (July 16, 2015)) and other agency orders as "records and reports of administrative bodies." ER-12 (quoting *Mack v. S. Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)); *see also* Fed. R. Evid. 201. This Court also may take

ticular, the FAA evaluates the impact of airport operations on air quality and the health and safety of the local community. FAA, Order 1050.1G § 1.2(b) (requiring the FAA to consider "[a]viation [e]missions and [a]ir [q]uality," "[s]ocioeconomics and children's health and safety risks," and other "[e]ffects on public health and safety" in its environmental reviews).

The FAA has repeatedly made air quality determinations for Sea-Tac. For example, before approving construction of Sea-Tac's third runway (which Plaintiffs allege resulted in significant new pollution, *see* ER-48 (¶ 27)), the FAA concluded that its air quality impact would be "*de minimis*" and would "conform[]" to national air quality standards, FAA, Record of Decision for the Master Plan Update Development Actions Sea-Tac International Airport, Seattle, Washington 23 (July 3, 1997) ("Third Runway ROD").[6] The FAA similarly approved the construction of Sea-Tac's new International Arrivals Facility, concluding that this expansion would not "result in emissions that would equal or exceed the applicable

---

judicial notice of the FAA and EPA orders cited herein. *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002).

[6] https://www.faa.gov/sites/faa.gov/files/airports/environmental/environmental_documents/rod_seattle.pdf.

de minimis threshold rates." FAA, Documented CatEx, Sea-Tac International Arrivals Facility, Att. E at 5 (Apr. 22, 2015).[7]

***Aircraft and Aircraft Engines.*** Each commercial airplane must meet thousands of exacting federal standards governing "the design, material, construction, quality of work, cybersecurity, and performance of aircraft [and] aircraft engines." 49 U.S.C. § 44701(a)(1); *e.g.*, 14 C.F.R. Parts 25-26 (airworthiness standards for commercial aircraft); *id.* Parts 33-34 (standards for aircraft engines and fuel systems).

The FAA has especially detailed regulations governing the design of nearly every part of aircraft engines and fuel systems. 14 C.F.R. Parts 33-34. These regulations address, among other things, materials, *id.* § 33.15, engine control systems, *id.* § 33.28, vibration, *id.* §§ 33.33, 33.63, fuel and induction systems, *id.* §§ 33.35, 33.67-.68, ignition systems, *id.* §§ 33.37, 33.69, and lubrication systems, *id.* § 33.39, 33.71. The FAA also regulates "the composition or chemical or physical properties of an aircraft fuel or fuel additive" to "control or eliminate aircraft emissions" that

---

[7] Published in App'x 2, Adoption of Existing Environmental Document: Seattle-Tacoma International Airport (STIA): International Arrivals Facility (May 5, 2015), https://www.portseattle.org/sites/default/files/2018-03/IAF_SEPA_Supplemental_Checklist_SIGNED.pdf.

"endanger the public health or welfare," 49 U.S.C. § 44714(1), and has accordingly issued regulations pertaining to fuel tanks, fuel systems, and fuel supply, *e.g.*, 14 C.F.R. §§ 25.951-.1001, 121.229-.235, 121.639-.647.

The FAA has issued additional standards governing the airworthiness of aircraft. *See* 14 C.F.R. §§ 23.1457-26.49. For transport category airplanes (*i.e.*, traditional commercial aircraft), the FAA has issued over 80 regulations concerning overall aircraft design and construction, *see id.* §§ 25.601-.899, and over 70 regulations pertaining to flight performance, such as lift, climb rates, and control and stability measures, *see id.* §§ 25.21-.255, 25.1501-.1587. There are still more standards governing other aspects of aircraft design, including the structure, hull, and load-bearing capabilities of the aircraft, which must be able to withstand high-stress conditions. *See id.* §§ 25.301-.581, 25.899, 25.901-.1207, 25.1501-.1801.

The FAA evaluates new versions of commercial aircraft to ensure their compliance with the requisite federal standards before airlines use them. 14 C.F.R. § 21.21(b)(1); *see also* 49 U.S.C. § 44704; 14 C.F.R. Parts

21, 25, 125; FAA, Order 8130.2K (Aug. 28, 2024).[8]  Once an aircraft enters service, additional regulations cover maintenance, 14 C.F.R. §§ 43.1-.17, with heightened requirements for commercial air carriers, *id.* §§ 121.361-.380, 121.1101-.1119.

*Aircraft Emissions.*  Congress authorized the EPA to issue "emission standards applicable to the emission of any air pollutant from . . . aircraft engines which in [its] judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7571(a)(2)(A).  Before issuing such standards, the EPA consults with the FAA and evaluates, among other things, the technological feasibility of the standards and the cost of compliance.  *Id.* § 7571(b).  The FAA then ensures manufacturer and carrier compliance with EPA standards.  *Id.* § 7572(a).

The EPA has issued regulations setting the acceptable limits for emissions of particulate matter, hydrocarbons, carbon monoxide, and nitrogen oxides from aircraft engines.  *See* 40 C.F.R. §§ 1031.30-.140; 14 C.F.R. §§ 34.20-.31.  In its most recent emissions rule, the EPA specifi-

---

[8] https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/document.information/documentID/1043002.

cally evaluated the health implications of aircraft emissions on communities near airports, including Sea-Tac. *See* EPA, Control of Air Pollution from Aircraft Engines: Emission Standards and Test Procedures, 87 Fed. Reg. 72,312, 72,321-22 (Nov. 23, 2022) (noting the findings of 2019 study regarding ultrafine particles near Sea-Tac).

## II. Factual And Procedural Background

Plaintiffs filed suit in 2023 on behalf of putative classes of all residents and property owners within a five-mile radius of Sea-Tac (the purported "Contamination Zone") in the preceding four years, alleging state-law claims for trespass, negligence, battery, and nuisance against Delta Air Lines, Inc. and Alaska Air Group (together, "Airlines"). ER-37-91. Plaintiffs asserted these same claims (except battery), plus an inverse condemnation claim, against the Port of Seattle, the municipal corporation that operates Sea-Tac. *Id.*

Plaintiffs claim that "[a]s aircraft . . . take off from and land at Sea-Tac Airport," they emit "pollutants" that "are sucked downwind and accumulate in local communities." ER-42, 57-61 (¶¶ 4, 53-64). According to the complaint, "when planes fly below 3,000 feet"—which, of course, is a necessity in take-off and landing—"there is not enough time for the

14

wind to fully disperse the pollutants," resulting in "concentrated" emissions "in the areas directly surrounding airports." ER-58 (¶ 57). Although Plaintiffs' claims focus on Defendants' operations at Sea-Tac, their state-law tort theories could be readily extended to other airports; indeed, Plaintiffs' complaint alleges similar harms at airports around the world—including Boston, Montreal, Athens, and Delhi. *See* ER-65-66 (¶¶ 72,74).

Plaintiffs contend that their alleged property "contaminat[ion]" is "the *direct result* of Defendants' flights in and out of Sea-Tac." ER-54 (¶ 50) (emphasis added). The thesis of the complaint is that "communities below *aircraft flight path*s ... are exposed to significant" aircraft emissions. ER-59 (¶ 61) (emphasis added); *see also* ER-42 (¶ 4) (alleging that rates of health conditions "are significantly higher in the Contamination Zone than in other Seattle communities *not under a flight path* or near Sea-Tac Airport" (emphasis added)); ER-58-59 (¶ 58) (alleging harm resulting from "large numbers of low over-flights in the Contamination Zone"); ER-60-61 (¶ 63) (alleging "a close association between *airplane landing paths* and fine particulate matter contamination" (emphasis added)); ER-63 (¶ 67 n.9) (alleging increased emissions at schools "within

15

0.5 miles of an *active flight path* serving Sea-Tac Airport" (emphasis added)).

The complaint thus directly and repeatedly ties Plaintiffs' alleged harms to the flight paths and frequency of the Airlines' flights over their homes. Plaintiffs allege their harms have increased "[o]ver the last decade," as the airport "has expanded its . . . facilities and has allowed an increase in the number of total flights into and out of Sea-Tac Airport." ER-53 (¶ 41). For example, one Plaintiff alleges that after Sea-Tac's "third runway became operational," he "found that his home was directly below the new flight path" and "noticed" an "increase in soot-like matter . . . on his property." ER-48-49 (¶ 27).

Plaintiffs further contend that these issues have been exacerbated by the opening of the new "International Arrivals Facility," which increased airport "capacity." ER-76 (¶ 91); *see also* ER-43 (¶ 6) (highlighting that "Defendants have recently expanded their operations at Sea-Tac"). And Plaintiffs claim that the problems will get worse in the future, as Delta "plan[s] for a spike in international traffic to Sea-Tac Airport" due to the new facility, and Alaska is implementing "aggressive growth plans" in the region. ER-77 (¶ 93).

In addition to a purported "decline in the value of their property," Plaintiffs allege that "airport-related pollutants" "increas[e]" the "health risks" they face, though no Plaintiff alleges any actual health issues as a result. ER-68, 73 (¶¶ 81, 84); *see* ER-45-52 (¶¶ 13-39). Plaintiffs request monetary damages for the reduction in the value of their properties and the creation of "a Court-supervised, Defendant-funded medical monitoring program." ER-88-89.

Importantly, Plaintiffs do not allege that Defendants have violated any of the extensive federal laws and regulations governing flight paths, aircraft design, and emissions. Plaintiffs' state-law tort claims instead allege harm based on Defendants' ordinary operations under such federal regulations.

The core of Plaintiffs' claims centers on the reasonableness of Defendants' actions. Reasonableness is the central element of many of their tort claims, and Plaintiffs' complaint explicitly asks whether Defendants acted with "reasonable care in their operations" and whether they "unreasonably interfer[ed]" with Plaintiffs' use and enjoyment of their properties. ER-81 (¶ 108); *e.g.*, ER-82-88 (¶¶ 110-47); *see Grundy v. Thurston County*, 117 P.3d 1089, 1092 (Wash. 2005) (en banc) ("Nuisance is a sub-

17

stantial and *unreasonable* interference with the use and enjoyment of land." (quotation marks omitted; emphasis added)); *Growers, Inc. v. Foremost Pump & Well Servs., LLC*, 506 P.3d 705, 710 (Wash. App. 2022) (standard of care in negligence action is "that of a *reasonably* prudent person under the circumstances" (emphasis added)).

Plaintiffs' claims thus ask that a factfinder evaluate the reasonableness of Defendants' flight paths and emissions levels or whether Defendants were "privileged to fly" in the Seattle airspace, considering flight altitudes, routes, rates of ascent and descent, flight frequency, and aircraft and engine design—all of which the complaint pleads as factors in the alleged damage to their properties. *Mills v. Orcas Power & Light Co.*, 355 P.2d 781, 789-90 (Wash. 1960) (holding aircraft "privileged to fly" in relation to trespass claims); *e.g.*, ER-42, 53-55, 57-61, 67, 73 (¶¶ 4, 41, 53-64, 76, 84-85).

Defendants moved to dismiss all claims. ER-107. They argued that Plaintiffs' claims are an impermissible collateral attack on the FAA and EPA orders and regulations setting flight paths and emissions standards and thus can be brought only by petitioning for review in a federal court of appeals. Defendants also argued that Plaintiffs' claims are preempted

expressly by the ADA and CAA and impliedly by field and conflict preemption.

The district court denied the motions to dismiss. ER-33. The court rejected Defendants' collateral-attack argument because it could not conclude at this point "that Plaintiffs' state-law claims are inescapably intertwined with the review of a particular agency order." ER-17. It rejected ADA and CAA express preemption as "premature." ER-27. The district court rejected field preemption by misconstruing the relevant field as "airplane pollution and its effects on people and property." ER-31. It rejected conflict preemption for similar reasons. *See* ER-33.

The district court nonetheless granted Defendants' subsequent motion for certification, concluding that each of the criteria in 28 U.S.C. § 1292(b) was satisfied. ER-34-36. The court acknowledged that other courts "have dismissed similar claims at the pleading stage, finding them 'inescapably intertwined' with agency orders or preempted by federal law," and that "reasonable jurists could disagree on whether factual development is necessary before resolving these threshold jurisdictional and preemption questions." ER-35.

Defendants timely petitioned for permission to appeal, which this Court granted. ER-92.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs' claims are a collateral attack on FAA and EPA orders and regulations. Plaintiffs allege that Defendants acted tortiously by operating flights in and out of Sea-Tac because Plaintiffs' properties were purportedly harmed by aircraft emissions. ER-82-88 (¶¶ 110-47). But Plaintiffs' claims are "inescapably intertwined" with the governing FAA and EPA orders and regulations, which set the flight paths to and from Sea-Tac and establish permissible emissions levels by balancing numerous safety and environmental considerations that Plaintiffs' claims would relitigate. *Tur*, 104 F.3d at 291-92. They thus constitute an improper collateral attack upon those agency decisions.

Only courts of appeals have jurisdiction to review claims challenging FAA and EPA orders and regulations. 49 U.S.C. § 46110(a), (c); 42 U.S.C. § 7607(b)(1). Because this suit was not initially filed in a federal court of appeals, the district court lacked jurisdiction and should have dismissed the case.

**II.**     Plaintiffs' claims also fail because they are both expressly and impliedly preempted by federal law.

**A.**     Plaintiffs' claims are expressly preempted by the ADA, which bars state-law claims "related to" an air carrier's "price[s], route[s], or service[s]." 49 U.S.C. § 41713(b)(1). Plaintiffs' allegations explicitly base Defendants' liability on aircraft following FAA-mandated flight paths taking off from and landing at Sea-Tac. Plaintiffs' claims therefore directly relate to the Airlines' routes and provision of service to Sea-Tac and fall within the ADA's broad preemptive sweep.

The district court held otherwise because it believed more factual development was needed, but the Supreme Court and other courts have readily resolved ADA preemption on the pleadings where, as here, the allegations are inextricably linked to aircraft rates, routes, or services. The district court also erred in requiring Defendants to show that Plaintiffs' claims would "bind" the Airlines to particular routes or services. This Court has already held that the "binds" test does not apply to common-law claims, and even if it did, that test is satisfied here because ongoing tort liability would necessarily force the Airlines to alter their routes or provision of service to Sea-Tac.

**B.** The CAA independently preempts Plaintiffs' claims. The CAA forecloses any state "standard respecting emissions" from aircraft or aircraft engines that is not "identical" to federal standards. 42 U.S.C. § 7573. Plaintiffs' claims seek to impose different aircraft emissions standards under state law and are therefore barred by the CAA.

The district court misconstrued this Court's decision in *California v. Department of Navy*, 624 F.2d 885 (9th Cir. 1980). *Navy*'s test for the application of the CAA is not at issue here, because the challenged emissions come directly from aircraft in operation. But even if it were, Plaintiffs' claims fail because the Airlines cannot change their emissions levels without modifying the design, operation, or performance of their aircraft.

**C.** Plaintiffs' claims are also barred because they intrude on the federally occupied field of airspace management, which the Supreme Court and this Court have long deemed preempted for reasons of safety and uniformity. *San Diego Unified Port Dist. v. Gianturco*, 651 F.2d 1306, 1311, 1316 (9th Cir. 1981) (per curiam) (citing *City of Burbank*, 411 U.S. at 627). The pervasive FAA regulations and orders directing flight paths, altitude, and air traffic confirm the breadth of this federally occupied field. The district court erred in narrowing the relevant field to air-

22

craft pollution because it focused on the labels on Plaintiffs' claims, rather than on the conduct they target. But even a field limited to aircraft emissions is still preempted, given the numerous EPA and FAA regulations governing aircraft emissions and design.

**D.** Plaintiffs' claims are separately preempted because they conflict with federal law. Plaintiffs' claims would make it impossible for the Airlines to comply with federal law while remaining in the marketplace, forcing the Airlines to face an impermissible choice: violate federal law— by deviating from the FAA-prescribed flight paths—or pay state-law damages. Any request for the Airlines to modify their aircraft would be an obstacle to the comprehensive regulatory scheme governing aircraft design and emissions, which reflects a careful balance of competing policy considerations, including safety, international uniformity, environmental impact, and consumer access.

## STANDARD OF REVIEW

This Court "review[s] *de novo* [a] district court's denial of [a] motion to dismiss." *Bennett v. United States*, 44 F.4th 929, 933 (9th Cir. 2022). The Court likewise reviews *de novo* both the district court's conclusions about whether to dismiss for lack of subject-matter jurisdiction because

the suit is a collateral attack on agency orders, *see Tur*, 104 F.3d at 291, and its decisions regarding preemption, *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551 (9th Cir. 2002).

## ARGUMENT

**I.    The District Court Should Have Dismissed Plaintiffs' Claims Because They Constitute A Collateral Challenge To FAA And EPA Orders And Regulations That Needed To Be Brought In A Court Of Appeals.**

Plaintiffs' claims are a collateral attack on FAA and EPA orders and regulations that must be challenged through a petition for review in a federal court of appeals.  Plaintiffs' tort claims seek relief for alleged pollution resulting from takeoffs and landings at Sea-Tac.  *E.g.*, ER-45, 47-48, 51-52, 88-89 (¶¶ 15, 18, 24, 28, 32, 38).  But these operations are pervasively and exclusively regulated by the FAA and EPA—from flight paths and runway locations to aircraft and engine design and corresponding emissions.  *See supra* pp. 5-14.

Juries are not authorized to reevaluate orders and standards adopted by the FAA and EPA.  Courts of appeals have exclusive jurisdiction to adjudicate petitions for review challenging FAA and EPA orders and regulations.  49 U.S.C. § 46110(a), (c) ("exclusive jurisdiction" for challenges to FAA orders lies in the D.C. Circuit or the court of appeals

where the challenger resides); 42 U.S.C. § 7607(b)(1) (challenges to EPA aircraft emissions standards "may be filed only in the" D.C. Circuit).[9]

A suit is an impermissible "collateral attack" on agency decisions when it is "inescapably intertwined" with agency actions or would effectively "re-litigate the merits of [prior] administrative proceedings." *Tur*, 104 F.3d at 292. And a suit is "inescapably intertwined" with an agency decision where it "arise[s] out of the particular facts" of a plaintiff's encounter with a private party acting pursuant to agency orders. *Gilmore v. Gonzales*, 435 F.3d 1125, 1133 & n.9 (9th Cir. 2006) (no district-court jurisdiction over claims challenging TSA security directive that applied to "airline operators").[10]

---

[9] Under this Court's precedent, aviation "agency rulemakings" qualify as "order[s]" subject to 49 U.S.C. § 46110. *Magassa v. Mayorkas*, 52 F.4th 1156, 1165-66 (9th Cir. 2022); *see also* 42 U.S.C. § 7607(b)(1).

[10] The Supreme Court recently confirmed that the collateral-attack doctrine applies to challenges to "agency actions" under the CAA in *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 154 (2025) (citing 42 U.S.C. § 7607(b)). The Court concluded that where the Hobbs Act governs a pre-enforcement challenge to agency action, an agency's interpretation of a statute can be challenged in a subsequent enforcement action in district court, but, in so holding, it contrasted the Hobbs Act with challenges under the CAA, which "expressly preclude[s] judicial review in subsequent enforcement proceedings." *Id.* at 153-54. The Supreme Court did not address challenges under the

## A.   Plaintiffs' Suit Is A Collateral Attack On The Governing FAA And EPA Orders And Regulations.

Plaintiffs seek to impose liability based on conduct that is governed by FAA and EPA orders and regulations and thus inescapably intertwined with them.  For example, Plaintiffs seek to impose liability for flying to and from Sea-Tac at low altitudes along flight paths over Plaintiffs' properties.  *E.g.*, ER-58-59 (¶¶ 57-58).  But these flight paths and approach altitudes are dictated by the FAA.  *See* FAA, Terminal Procedures Publication, Northwest at 730-78 (approach and takeoff routes for Sea-Tac); FAA, Order JO 7110.65BB, § 2-1-2 (air traffic controllers can modify routes as needed).  The FAA set and optimized the flight paths to minimize fuel burn and reduce environmental impact.  Greener Skies FONSI at 2-3.

In the Greener Skies FONSI, the FAA specifically considered the effect that new Sea-Tac flight paths would have on air quality (including the levels of various chemical compounds Plaintiffs complain of) and designed the routes to "reduc[e] environmental impacts while also enhanc-

---

ADA, and in any event, its holding permitting some after-the-fact challenges to an agency's reasoning was limited to "enforcement proceedings." *See id.* at 155.  Plaintiffs' suit affirmatively challenges agency actions; it does not seek to enforce them.

ing the safety of operations in the airspace around [Sea-Tac]." Greener Skies FONSI at 72, 147. The FAA also considered the socioeconomic, environmental, and children's health and safety effects of the flight paths and concluded there would be "no adverse impacts." *Id.* at 153. Plaintiffs' tort claims—which sound in nuisance and negligence—would ask a jury to assess the reasonableness of these determinations and the proper flight paths to establish all over again.

Plaintiffs further allege that damage is "caused by airplanes flying in and out of Sea-Tac Airport, especially from the third runway." ER-48-50 (¶ 27). But the FAA specifically authorized and approved that runway after finding that it would produce "no significant air quality impacts" and that "no air quality mitigation is necessary." Third Runway ROD at 23. A demand that Defendants pay "'compensation' for their usage" of FAA-approved flight paths and runways or "adopt additional measure[s] to mitigate any damages to plaintiffs" is a "challenge" to "the propriety [of] FAA's rulemaking and final decision." *McKay v. City & County of San Francisco*, 2016 WL 7425927, at *5 (N.D. Cal. Dec. 23, 2016) (citation omitted).

27

Plaintiffs likewise collaterally attack the EPA orders promulgating aircraft emissions standards by claiming liability for purported damages caused by aircraft emissions occurring under those standards. *See, e.g.*, 40 C.F.R. § 1031.60; 14 C.F.R. §§ 34.20-.31; ER-61, 67 (¶¶ 64, 76). The EPA sets aircraft emissions standards based on a number of factors within its purview as an expert agency and consistent with the United States' treaty obligations. *E.g.*, 87 Fed. Reg. at 72,333-34; *see supra* pp. 7-8. Where, as here, the EPA has already authorized emissions as "reasonable and appropriate," 87 Fed. Reg. at 72,324, a suit seeking a contrary conclusion is a collateral attack on the regulations adopting those standards that must be brought in a court of appeals, *see Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 506 (9th Cir. 2015) (42 U.S.C. § 7607(b)(1) "channels review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed*" (quoting *Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996)) (emphasis in original)); *New England Legal Found. v. Costle*, 666 F.2d 30, 33 (2d Cir. 1981) (nuisance claim against power plant "is, in effect, an attack upon the validity of the EPA-approved" order that "must be addressed to the courts of appeals" (citation omitted)).

28

Indeed, other district courts in this Circuit have reached the opposite conclusion from the court below when confronted with similar claims. The *McKay* court held that the plaintiffs' claims of "disturbance and pollution" from "flights over their homes"—even if couched in the guise of a tort suit seeking damages—were "inescapably intertwined" with the FAA orders authorizing the flight paths over the plaintiffs' properties because the "genesis of these complaints is the flight paths." 2016 WL 7425927, at *1, *7 (quoting *Crist v. Leippe*, 138 F.3d 801, 803 (9th Cir. 1998)). Whether the noise and pollution resulting from overhead flights was *unreasonable* could not be separated from the FAA orders setting the flight paths. *Id.*

Likewise, in *Krauss v. FAA*, the court concluded that it lacked subject-matter jurisdiction over nuisance claims alleging that the defendants "unlawfully harmed [p]laintiffs by 'deploy[ing]' the new . . . flight paths mandated by the FAA." 2016 WL 1162028, at *3 (N.D. Cal. Mar. 24, 2016). The court held that the claims were "collateral attacks against the lawfulness of the FAA's order" that could be brought only in the "federal circuit courts." *Id.*

29

The same is true here. A jury evaluating Plaintiffs' claims would have to determine the reasonableness of the flight paths and engine emissions. Reasonableness is the central element of several of Plaintiffs' tort claims; indeed, Plaintiffs affirmatively allege that their claims will require the factfinder to determine whether Defendants acted with "reasonable care in their operations." ER-81 (¶ 108); *see also* ER-82-88 (¶¶ 110-147); *supra* pp. 17-18. But that would constitute impermissible "re-litigat[ion of] the merits of the previous administrative proceedings" setting those flight paths and emission standards. *Tur*, 104 F.3d at 292. Because Plaintiffs' suit was not initially filed in a federal court of appeals, the district court lacked jurisdiction and should have dismissed the case. *Id.*[11]

---

[11] Plaintiffs are not without recourse. They are free to petition the FAA and EPA for new rulemakings. *See* 5 U.S.C. § 553(e). If Plaintiffs are dissatisfied with the agencies' resolution of their concerns, they can then seek review in the appropriate court of appeals. In fact, the FAA is already in the midst of a NEPA review of Sea-Tac's long-term development plan that will address numerous issues including air quality. ER-64-66; Port of Seattle, Sustainable Airport Master Plan, https://www.portseattle.org/plans/sustainable-airport-master-plan-samp. Plaintiffs can seek involvement in these proceedings and then seek appellate review as needed.

## B. The District Court Erred By Declining To Apply The Collateral-Attack Doctrine.

Each of the district court's reasons for refusing to apply the collateral-attack doctrine lacks merit.

First, the court declined to apply the doctrine because, in its view, the "argument assumes that Defendants are complying with FAA and EPA regulations," which the court could not resolve on a motion to dismiss. ER-17-18. But Plaintiffs' complaint contains *no* allegations that Defendants violated any FAA or EPA orders or regulations. Rather, as pleaded, Plaintiffs' claims would hold Defendants liable under state law simply for *complying* with federally mandated orders and regulations on flight paths and emissions standards. Because "plaintiffs are the masters of their complaint," any question of noncompliance with the governing FAA and EPA orders and regulations is not presented. *Corber v. Xanodyne Pharms., Inc.*, 771 F.3d 1218, 1223 (9th Cir. 2014).

Regardless, application of the collateral-attack doctrine does not turn on compliance questions because the issue is whether the claims are "inescapably intertwined" with agency orders. *Tur*, 104 F.3d at 292. Where conduct regulated by an order is challenged, the merits of that order are necessarily intertwined with an evaluation of the conduct.

31

Thus, in *McKay*, it did not matter "whether or not [defendants] compl[ied] with FAA orders" setting flight paths. 2016 WL 7425927, at *7. Because "flight paths" allegedly caused the complained-of pollution, the tort claims were factually "intertwined" with a review of the FAA orders setting those flight paths. *Id.* The same reasoning applies here. Because Plaintiffs' alleged injuries are based on "flight paths" and "aircraft emissions" levels, ER-59-61 (¶¶ 61, 64), evaluating their claims would necessarily entail evaluating the FAA orders directing those flight paths or the EPA orders and regulations setting emissions levels.

Indeed, even where noncompliance with agency orders is alleged, as in *McKay*, any determination of the reasonableness of that noncompliance—a central inquiry of tort law—hinges on the propriety of the orders, since it might be unreasonable to follow an ill-conceived order. Where challenged conduct is regulated by agency orders, a review of the conduct remains "inescapably intertwined" with the merits of those orders, regardless of compliance. *Tur*, 104 F.3d at 292.

Second, the district court reasoned that the collateral-attack doctrine did not apply because Plaintiffs are not requesting to "enjoin specific flight paths." ER-17-18. But there is no "damages only" exception

32

to the collateral-attack doctrine; state-law claims can just as readily present a collateral attack on agency orders through a request for damages as they can through a request for an injunction. In fact, this Court has "a body of caselaw" barring a district court "from hearing a damages claim that is 'inescapably intertwined with a review of the . . . merits surrounding the FAA's order,'" which the district court acknowledged (at ER-16) but failed to apply. *Americopters, LLC v. FAA*, 441 F.3d 726, 736 (9th Cir. 2006) (quoting *Crist*, 138 F.3d at 803); *see also Green v. Brantley*, 981 F.2d 514, 521 (11th Cir. 1993) (suit for damages "inescapably intertwined with a review of the procedures and merits" of an FAA order was an "impermissible collateral challenge").

Here, reviewing claims for damages that are explicitly based on "aircraft flight paths" and "aircraft emissions" levels, ER-59, 61 (¶¶ 61, 64), is necessarily entwined with a review of the FAA and EPA orders and regulations setting those flight paths and emissions standards. *See Krauss*, 2016 WL 1162028, at *4.

Third, contrary to the district court's reasoning, it makes no difference that "Plaintiffs do not expressly challenge or cite to any agency order" and have not "sued a federal agency or agency official." ER-17.

33

Plaintiffs cannot make a "thinly disguised attempt at an end-run around the jurisdictional limitation[s]" by suing private parties or omitting references to the governing agency orders that direct and authorize the Airlines' purportedly tortious conduct. *Mace v. Skinner*, 34 F.3d 854, 860 (9th Cir. 1994). As this Court has held, district-court suits "aris[ing] out of the particular facts of [a plaintiff's] encounter with [an airline]" are barred by the collateral-attack doctrine when the airline's conduct is governed by federal orders. *Gilmore*, 435 F.3d at 1133 n.9.

It is irrelevant that Plaintiffs deny "challeng[ing] the validity of the FAA order[s]" at issue. *McKay*, 2016 WL 7425927, at *7. As the court in *Krauss* explained, "any 'objections or claims' that challenge the lawfulness of [non-federal defendants'] *mere compliance*" with the FAA's flight-path orders "constitute 'impermissible collateral attacks' against . . . the FAA's decision to implement the [flight paths." 2016 WL 1162028, at *3 (emphasis added; citation omitted). Plaintiffs raise precisely such "objections and claims" here.

*     *     *

Because Plaintiffs' claims would effectively relitigate FAA and EPA orders and regulations setting flight paths and approving emissions lev-

els, their suit is a collateral challenge to these orders that can be brought only in a federal court of appeals or, specifically, the D.C. Circuit. *Tur*, 104 F.3d at 292. The Court should order dismissal of Plaintiffs' complaint for lack of subject-matter jurisdiction.

## II. Plaintiffs' Claims Are Preempted By Federal Law.

Plaintiffs' claims should also be dismissed because they are preempted three times over. Because federal law is "the supreme Law of the Land," U.S. Const. art. IV, cl. 2, it preempts state law if: (1) Congress "enact[s] a statute containing an express preemption provision," (2) Congress implicitly "determine[s]" that a certain field "must be regulated by [the federal government's] exclusive governance," or (3) the state law "conflict[s] with federal law" because complying with both laws "is a physical impossibility" or the state law "stands as an obstacle" to Congress's objectives, *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (citation omitted).

All three types of preemption extend to common-law claims like this tort action, and all three types are triggered here. *See, e.g.*, *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 281-82 (2014) ("state common-law rules fall comfortably within the language of the ADA pre-emption provision"); *Mon-*

35

*talvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007) (state tort claims barred by field preemption); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 490 (2013) (same for conflict preemption). Plaintiffs' claims are expressly preempted by both the ADA and the CAA. Plaintiffs' claims impermissibly invade the field of airspace management, which is pervasively regulated by the FAA and EPA. And Plaintiffs' claims conflict with federal law, because they would make it impossible for Defendants to comply with FAA flight-path directives and would present an obstacle to the carefully balanced federal regulatory schemes governing aircraft emissions and design.

Importantly, contrary to the district court, ER-27, the analysis must be done with a thumb on the scale *in favor of* preemption—not *against* it. Although courts "start[]" with a presumption against preemption where the "historic police powers of the States" are at issue, ER-24 (citation omitted), that presumption does *not* apply "when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 90 (2000). "[R]egulation of this country's airspace" is one such area, *Montalvo*, 508 F.3d at 471, and the Court has "decline[d] to apply a general presumption against

36

preemption" in this context, *In re Korean Air Lines Co., Antitrust Litig.*, 642 F.3d 685, 693 n.6 (9th Cir. 2011).

Instead, the Court has "recognized that 'preemptive intent is *more readily inferred*' in the field of aviation.'" *Nat'l Fed'n of the Blind*, 813 F.3d at 724 (emphasis added) (quoting *Montalvo*, 508 F.3d at 471). Moreover, where a statute "'contains an express pre-emption clause'"—as both the ADA and CAA do—"[courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation omitted).

Applying these principles to Plaintiffs' complaint makes clear that each of their claims is preempted.

## A.   Federal Law Expressly Preempts Plaintiffs' Claims.

Plaintiffs' claims are expressly preempted by both the ADA and the CAA.

### 1.   The ADA Preempts Plaintiffs' Claims.

**a.   *The ADA's "related to" inquiry is appropriately resolved on the pleadings*.**   The ADA expressly preempts any state "law, regula-

tion, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The phrase "related to" is "deliberately expansive" and "conspicuous for its breadth." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (citations omitted). Any suit "having a connection with" airline rates, routes, or services is thus preempted, even if "the effect [of the suit] is only indirect" or if the cause of action "is not specifically designed to affect" airline rates, routes, or services. *Id.* at 386 (citations omitted). Laws and claims that "bear[] a 'reference to'" "rates, routes, or services" necessarily "relate to" them and are preempted. *Id.* at 384, 388 (citation omitted). And ADA preemption applies regardless of whether the state standard is "consistent" or "inconsistent" with federal law. *Id.* at 386-87.

The word "routes" generally refers to "courses of travel" and "the point-to-point transport of passengers." *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc). Similarly, "service" refers to "the provision of air transportation to and from various markets at various times," including "such things as the frequency and scheduling of transportation, and [] the selection of markets to or from which trans-

38

portation is provided (as in, 'This airline provides service from Tucson to New York twice a day.')." *Id.* at 1265-66.

The Supreme Court has made clear that, given the ADA's broad sweep, applying ADA preemption on the pleadings is straightforward in cases where the complaint's allegations necessarily relate to a "price, route, or service." 49 U.S.C. § 41713(b)(1). The Supreme Court has twice reversed decisions at the motion-to-dismiss stage that had held that state-law claims were not sufficiently "relate[d] to" "rates, routes, and services" under the ADA. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995); *Ginsberg*, 572 U.S. at 279, 284-85.[12] In *Wolens*, the Supreme Court was "satisfied" in *three sentences* that an air carrier's changes to provisions of its frequent flyer program regarding "mileage credits" and "upgrades" "relate[d] to 'rates'" and "'services,'" finding no need to "dwell on the question." 513 U.S. at 226. Likewise, in *Ginsberg*, the Court readily held that a single customer's claims challenging termination from the

_____

[12] The lower court opinions demonstrate that *Wolens* and *Ginsberg* were reviewed on motions to dismiss. *See Wolens v. Am. Airlines, Inc.*, 626 N.E.2d 205, 206 (Ill. 1993); *Ginsberg v. Nw., Inc.*, 695 F.3d 873, 875 (9th Cir. 2012).

elite level of a frequent flyer program "clearly" had a "connection with" the "airline's 'rates'" and "services." 572 U.S. at 284.

Following the Supreme Court's approach, this Court and others have similarly resolved the ADA's "related to" inquiry on the pleadings. For example, in *In re Korean Air Lines*, this Court concluded that the plaintiffs' allegations "that Defendants engaged in price-fixing" were "plainly related to a price of an air carrier and consequently [were] preempted." 642 F.3d at 696-97. Other courts have likewise had no trouble finding claims bearing some connection to air carrier rates, routes, or services preempted without the need for discovery. *E.g.*, *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 382-83 (5th Cir. 2004) (holding that tort claim alleging air carrier "fail[ed] to provide adequate leg room" was preempted "[s]ince requiring more leg room would necessarily reduce the number of seats on the aircraft" and thus "impose a standard 'relating to price'"); *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 608-11 (7th Cir. 2000) (approving of district court's view that tort claims regarding contracts with regional air carriers "relate to an air carrier's routes— they concern which carriers fly to which destinations from which airports"); *Fudge v. Delta Air Lines, Inc.*, 753 F. Supp. 3d 987, 993 (C.D. Cal.

2024) (dismissing as preempted claims that a carrier improperly disclosed consumers' personal information entered on its website because the "connection between Plaintiffs' claims and [the airline's] services is clear"—"online booking" is "connected directly to 'access to flights'").

b. ***Because they are premised on the Airlines' flight paths and flight frequency, Plaintiffs' claims plainly "relate to" the Airlines' "routes" and "services."*** The ADA preempts Plaintiffs' claims because they have an impermissible "connection with" and bear "reference" to the Airlines' "routes" and "services" at Sea-Tac. *Morales*, 504 U.S. at 384 (citation omitted). The complaint explicitly identifies the Airlines' routes and services as the cause of Plaintiffs' alleged harm: the alleged property "contaminat[ion]" is the "direct result of *Defendants' flights in and out of Sea-Tac Airport*." ER-55 (emphasis added). And the alleged liability is rooted in the "flight paths"—repeatedly referenced in the complaint—used by aircraft "tak[ing] off from and land[ing]" at Sea-Tac, which go over Plaintiffs' properties. ER-59, *see supra* pp. 14-15. It is also based on flight frequency, which the complaint alleges has "increase[d]" "[o]ver the last decade." ER-53. These allegations make clear that Plaintiffs' theory of liability hinges on the Airlines' "courses of

41

travel" and "provision of air transportation to and from [Sea-Tac] at various times"—*i.e.*, their routes and services. *Charas*, 160 F.3d at 1265-66.

Plaintiffs cannot recharacterize their claims as focused on the Airlines' emissions, rather than their routes, and argue that the Airlines can keep flying the same routes, but do so less frequently, with different aircraft, or with different engines. *Cf.* ER-41 (alleging "harm caused by Defendants' emission of . . . pollutants"). Plaintiffs would still be seeking recovery because the Airlines fly certain routes—leading to emissions over their homes—rather than others. *E.g.*, ER-59 (alleging that "Defendants' . . . aircraft[] . . . rain down pollutants" when they "take off from and land at Sea-Tac"). Thus, the sought-after damages would still relate to the Airlines' routes and be preempted. And, in any event, the frequency of flights, the type of aircraft flown, and the type of engine used all relate to the Airlines' services. *See Charas*, 160 F.3d at 1266. Plaintiffs' claims are barred by the ADA.

**c.** ***The district court erred by declining to dismiss Plaintiffs' claims on the basis that factual development was needed.*** The district court refused to dismiss Plaintiffs' claims on the theory that the ADA preemption issue "requires factual findings." ER-27. But the court no-

42

where specified what additional facts it would need to resolve the preemption issue. Nor could it: If terminating a single frequent flyer's status "clearly" had a "connection with" the "airline's 'rates'" and "services" in *Ginsberg*, 572 U.S. at 284 (citation omitted), no factual development is needed to see that a putative class action on behalf of 300,000 individuals seeking damages for alleged injuries "caused by airplanes travelling to and from Sea-Tac," ER-42, 44-45 (¶¶ 4, 11), implicates the Airlines' "routes" and "services."

Nothing about "the Rule 12(b)(6) standard," ER-27, justifies the district court's decision to defer resolving whether Plaintiffs' claims fall within the ADA's preemption clause; as the Supreme Court has recognized, that inquiry typically should be straightforward at the pleadings stage, *see Wolens*, 513 U.S. at 226. And, as the district court itself acknowledged, Plaintiffs' "factual allegations about flight frequency and Plaintiffs' proximity to the airport" are "certainly relevant" to "Plaintiffs' claims." ER-27. If the Airlines were not compelled by the FAA to fly routes reasonably proximate to Plaintiffs' properties, Plaintiffs would have no conceivable basis for their claims. No further factual develop-

ment is required to conclude that those claims relate to the Airlines'
"routes" and "services" and are therefore preempted by the ADA.

### d. *The district court erred in relying on the inapposite "binds" test.* The district court also erred in holding that ADA preemption could not be resolved on the pleadings because it is not "self-evident" from the complaint that the Airlines "would be impermissibly bound 'to a particular price, route, or service' if Plaintiffs succeed." ER-27. In doing so, the court relied on a line of decisions suggesting that ADA preemption turns on whether the claims, "directly or indirectly, *bind*[] the carrier to a particular price, route or service and thereby interfere[] with the competitive market forces within the industry." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014) (quoting *Am. Trucking Ass'ns, Inc. v. Los Angeles*, 660 F.3d 384, 397 (9th Cir. 2011)). But this Court has already held that the "binds" standard does not govern in the context of common-law claims like those here, and thus it was error for the district court to apply it. *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1024-25 (9th Cir. 2020).[13]

---

[13] Although *Miller* was decided under the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1) ("FAAA"), it ap-

In *Miller*, this Court rejected the notion that the "binds" test dictates whether common-law causes of action are preempted. 976 F.3d at 1024-25. Because common-law claims typically involve general standards of care—*e.g.*, reasonableness—"[i]t therefore does not make sense" to ask whether such claims "'bin[d]' [a party] to a particular price, route or service." *Id.* at 1025. Indeed, if the ADA "only preempts state laws that bind [carriers] to specific prices, routes, or services," "few common-law claims, if any, would be preempted," since they only "impos[e] broad standards of conduct." *Id.* But under Supreme Court precedent, "there is no question that common-law claims are within the scope of the preemption clause." *Id.*; *see Ginsberg*, 572 U.S. at 283 ("What is important . . . is the effect of a state law . . . not its form, and the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute or regulation."). The correct inquiry for determining whether a particular common-law claim is preempted is the one Congress spelled out: whether the claim is "related to" rates,

---

plies with equal force to the ADA because Congress "copied the language of the [ADA]'s air-carrier pre-emption provision" in the FAAA, and courts therefore apply the same standards in analyzing preemption questions under both statutes, *see Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008).

45

routes, or services, *i.e.*, whether "the existence of [a price, route or service] is essential" to the claim. *Miller*, 976 F.3d at 1022 & n.2 (citation omitted).

Even this Court's cases invoking the "binds" standard "acknowledge[] that the scope of . . . preemption is broader than [the 'binds'] language suggests," and in any event, those cases are far afield here. *Miller*, 976 F.3d at 1025. This Court has asked whether a provision "binds" a carrier to specific routes or services only in "borderline" cases "in which a law does not refer directly to rates, routes, or services." *Dilts*, 769 F.3d at 646. Those cases have largely involved "wage and hour laws" that control carriers' "agreements with their workers." *Miller*, 976 F.3d at 1024.[14]

That is a far cry from the tort claims here and in *Miller*, which "seek[] to hold [carriers] liable at the point at which [they] provide[] a 'service' to [their] customers." 976 F.3d at 1024. In *Miller*, this was a freight broker's allegedly unsafe selection of a motor carrier, *id.* at 1020,

---

[14] Among those are the decisions the district court cited. *See* ER-26-27 (citing *Dilts*, 769 F.3d at 641-42 ("meal and rest break laws" for delivery drivers and installers); *Air Transp. Ass'n of Am. v. City & County of San Francisco*, 266 F.3d 1064, 1072 (9th Cir. 2001) (regulation applicable to "travel benefits" for employees and other "employee discounts")).

46

1024; here, it is the operation of the aircraft itself in take-off and landing at Sea-Tac. As this Court concluded in *Miller*, there is "no reasonable ground for distinguishing *Ginsberg*"—which also involved common-law claims—"from this case." *Id.* at 1024. If "a claim that seeks reinstatement of frequent-flyer benefits has a forbidden 'connection with' air carrier services," attempts to regulate the take-off and landing of aircraft necessarily are "directly 'connect[ed] with'" carrier services. *Id.*

But even if the "binds" test applied, it too would compel the conclusion that Plaintiffs' claims are preempted. By imposing tort liability, the practical effect of Plaintiffs' claims would be to "bind" the Airlines to adopt different routes that avoid Plaintiffs' properties—which, of course, the Airlines cannot do since their flight paths are dictated by the FAA—or to stop services to Sea-Tac. *See supra* pp. 5-9.

It would not be a viable alternative for Defendants simply to keep operating on the same flight paths and pay damages to Plaintiffs. Damages follow a liability determination, and "[t]he obligation to pay compensation . . . is designed to b[e] a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *see Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008).

47

The "purpose of tort liability is to induce defendants to conform their conduct to a [state] standard of care," and a defendant held liable "*is expected to modify*" its behavior "to reduce the risk of injury" going forward, regardless of the remedy imposed. *Law v. Gen. Motors Corp.*, 114 F.3d 908, 910 (9th Cir. 1997) (emphasis added).

The only way for Defendants to avoid ongoing liability under Plaintiffs' theories would be to alter their services or suspend their flights to Sea-Tac. But that would obviously change "the provision of air transportation to and from" Sea-Tac. *Charas*, 160 F.3d at 1266; *cf. Ventress v. Japan Airlines*, 603 F.3d 676, 683 (9th Cir. 2010) ("potential to ground a flight" amounts to "service" interruption (citation omitted)).

"[R]equir[ing] carriers" to change the services that they "would prefer . . . to offer" would "produce[] the very effect that the [ADA] sought to avoid"—state laws overriding "'competitive market forces' in determining . . . the services that . . . carriers will provide." *Rowe*, 552 U.S. at 370-72 (citation omitted) (state law requiring carriers to "follo[w] particular delivery procedures" preempted); *see Morales*, 504 U.S. at 378 (noting that the ADA's preemption provision was meant "[t]o ensure that the States would not undo federal deregulation," which sought to unleash

48

"competitive market forces" in air transportation).  Plaintiffs' claims are therefore preempted under the ADA.

### 2.    The CAA Preempts Plaintiffs' Claims.

**a.**    Under Section 233 of the CAA, no State "may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part."  42 U.S.C. § 7573.  The plain text is broad and clear:  States cannot regulate aircraft emissions whatsoever—States cannot even "*attempt* to enforce *any* standard"—unless the state law is "identical to" the EPA's aircraft emissions standards.

The "applicable" standards are those set by the EPA under Section 231 of the CAA.  That provision broadly authorizes the EPA, in consultation with the FAA, to establish "standards applicable to the emission of *any* air pollutant from *any* class or classes of aircraft engines," which the FAA then enforces.  42 U.S.C. § 7571(a)(2)(A) (emphases added); *see also* 40 C.F.R. §§ 1031.30-.140 (EPA standards); 14 C.F.R. §§ 34.20-.31 (FAA's codification of EPA standards).

Underscoring its expansive preemptive reach, Section 233 stands in marked contrast to CAA Section 209, which preempts state standards

49

"relating to the control of emissions from new motor vehicles" but preserves "the right" of States and localities to "otherwise" regulate in-use motor vehicles.  42 U.S.C. § 7543(d).  Section 233 contains no similar savings clause—confirming that state law has no role in regulating the emissions of in-operation aircraft unless the state and federal standards are identical.  As the EPA rightly concludes, "CAA section 233 vests the authority to promulgate emission standards for aircraft or aircraft engines *only* in the Federal Government."  87 Fed. Reg. at 72,316 (emphasis added).

Under the plain text of Section 233, preemption is straightforward: If the state-law standard is not identical to the federal-law standard, it is preempted.  *Cf. Exxon Corp. v. City of New York*, 548 F.2d 1088, 1095 (2d Cir. 1977) (holding city regulation of gasoline lead content preempted under similarly worded provision in CAA Section 211 barring state controls that are not "identical" to EPA regulations).

Here, that inquiry is easy.  Plaintiffs' attempt to hold the Airlines liable under state tort law for emitting "high levels of pollutants," regardless of compliance with federal law, means that Plaintiffs necessarily seek to impose a state standard that is different from federal law.  ER-

41; *see* ER-37-90 (not once alleging violation of EPA standards). Their claims are therefore preempted under the plain language of Section 233, and the district court was wrong to conclude that compliance with federal law was a factual issue preventing dismissal. *See* ER-29.

**b.** The district court was also wrong to deny dismissal under this Court's decision in *Navy*. *See* ER-29. That decades-old decision dealt with the threshold question whether "jet engine test cells" counted as "moving sources of pollution" falling "within the intended scope of § 233" or could be regulated under "state implementation plans" enforcing EPA standards on ambient air quality for stationary sources. *Navy*, 624 F.2d at 887. Congress has since answered the question—providing that States may regulate emissions of nitrogen oxides from aircraft engine test cells following EPA study, *see* Pub. L. No. 101-549, § 233, 104 Stat. 2399, 2529-30 (1990) (codified at 42 U.S.C. § 7571 note), and EPA now regulates other emissions from test cells under its stationary-source authority, *see* EPA, National Emission Standards for Hazardous Air Pollutants: Engine Test Cells/Stands Residual Risk and Technology Review, 85 Fed. Reg. 34,326, 34,327 (June 3, 2020) (relying on authority from Section 112 of the Clean Air Act, 42 U.S.C. § 7412); 40 C.F.R. Part 63, subpart PPPPP

51

(EPA emission standards for engine test cells). But before Congress had spoken, this Court reached a similar conclusion in *Navy*. The test cells—"substantial concrete structures" on the ground housing "detached jet engines"—were "subject to state pollution regulations." *Navy*, 624 F.2d at 886, 889.

To make this determination, the Court relied on a test developed by the district court asking whether "the state pollution regulations can be met without affecting the design, structure, operation, or performance of the [aircraft or] aircraft engine" or the "impairment of the effectiveness and accuracy of the tests conducted." *Navy*, 624 F.2d at 888 & n.5. Because there were "apparently numerous ways to modify test cell smoke stacks" to reduce emissions, the Court ruled that the state regulations would not be regulating the "engines themselves" and were not preempted by Section 233. *Id.* at 888 & n.6.

But *Navy* made plain that direct regulation of aircraft was prohibited. This Court embraced the reasoning of the district court explaining that Section 233 is designed to protect "the owner and the manufacturer of the [aircraft] and the engine against the 'chaos' of multiplex standards for entities which readily traverse state lines." *California v. Dep't of*

52

*Navy*, 431 F. Supp. 1271, 1285 (N.D. Cal. 1977), *aff'd*, 624 F.2d at 888 (registering "general agreement" with district court's "extensive[] and excellent[]" preemption analysis). And the parties in *Navy* "agree[d]" that "Congress preempted . . . the regulation of pollution from aircraft and aircraft engines." 624 F.2d at 887. Again, the only "question" was whether "immobile test cells" fell within that category. *Id.*

Here, unlike *Navy*, there can be no question that the emissions at issue come *directly* from "aircraft and aircraft engines" without intermediation. *See* 431 F. Supp. at 1282-83, 1285. Plaintiffs complain of emissions from aircraft taking off and landing at Sea-Tac. *E.g.*, ER-59 (¶ 59). There are no test cells—or even buildings housing the aircraft—to mediate the emissions. Thus, there was no reason for the district court to apply *Navy*'s threshold test for assessing Section 233 preemption.

Plaintiffs' claims also fail under *Navy*. If Plaintiffs prevail, then their state-law claims will necessarily affect "the design, structure, operation, or performance of the [aircraft or] aircraft engine." *Navy*, 624 F.2d at 888. The district court theorized that "there may be" other "ways of controlling emissions," apart from "aircraft alterations." ER-29. But the district court did not explain—or even suggest—what those other ways

53

conceivably could be, nor have Plaintiffs. Complaints are assessed on the basis of plausibility, not theoretical possibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). No factual development is needed to conclude that to reduce the emissions of aircraft in use, the Airlines would have to alter the design, operation, or performance of their aircraft. Either the Airlines would need to "prevent creation of certain emissions" or "prevent those emissions from leaving the engine"—the very thing that *Navy* forbids. 431 F. Supp. at 1283.

The complaint therefore makes clear that Plaintiffs' state-law claims are preempted by the CAA.

### B.    Plaintiffs' Claims Are Foreclosed By Field Preemption.

Plaintiffs' claims are also foreclosed by the pervasive federal regulation of the field of airspace management, which the FAA occupies for reasons of safety.

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress intends to subject a field to exclusive federal control when the federal "framework of regulation [is] 'so pervasive that

54

Congress left no room for the States to supplement it,'" or when "there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (omissions accepted; citation omitted). Both the "comprehensiveness of a statute" and the "pervasiveness of the regulations enacted pursuant to [that] statute" are used to demonstrate federal "control" of a field. *Montalvo*, 508 F.3d at 470, 473. Field preemption bars any state standards that fall into a federally occupied field, even ones that are "parallel" or "complementary" to the federal regime. *Arizona*, 567 U.S. at 401.

A state-law cause of action is foreclosed by field preemption when it attempts to "regulat[e] *conduct* in a field that Congress . . . has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399 (emphasis added). Accordingly, in "delineat[ing] the pertinent regulatory field," courts focus on the reach of the federal regulatory scheme and the conduct that it targets. *Nat'l Fed'n of the Blind*, 813 F.3d at 734. Here, Plaintiffs' claims impermissibly seek to apply state law to regulate the pervasively regulated federal field of airspace management.

### 1. Congress Has Given Exclusive Authority To The FAA To Regulate Airspace Management.

Under the Federal Aviation Act ("FAAct"), of which the ADA is a part, the federal government wields "exclusive sovereignty [over the] airspace of the United States," 49 U.S.C. § 40103(a)(1), and Congress has vested the corresponding authority to regulate in the FAA, *id.* § 40103(b). The FAA is thus charged with "develop[ing] plans and policy for the use of the navigable airspace" and issuing "regulation[s] or order[s]" on the "use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." *Id.* § 40103(b)(1). And the FAA is further directed to "prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for (A) navigating . . . aircraft; (B) protecting individuals and property on the ground; (C) using the navigable airspace efficiently; and (D) preventing collision between aircraft." *Id.* § 40103(b)(2).

Achieving the "delicate balance between [aviation] safety and efficiency . . . and the protection of persons on the ground" that Congress directed "requires a uniform and exclusive system of federal regulation." *City of Burbank*, 411 U.S. at 638-39. Congress enacted the FAAct in the wake of "a series of 'fatal air crashes between . . . aircraft operating under

separate flight rules.'" *United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir. 1969) (citation omitted). By mandating the comprehensive federal regulation of airspace, Congress sought to achieve "a single, uniform system for regulating aviation safety" by "creat[ing] and enforc[ing] one unified system of flight rules." *Montalvo*, 508 F.3d at 471 (quoting *Christensen*, 419 F.2d at 1404).

Accordingly, the FAA has issued hundreds of regulations and orders that govern every aspect of airspace management—from the precise flight paths and altitudes at which aircraft must fly and the traffic rules on how to circle an airport, to the procedures for taking off and landing and the location and design of runways, *supra* pp. 5-11. The "density and detail" of these standards, *Nat'l Fed'n of the Blind*, 813 F.3d at 734, reflect the "exclusive system of federal regulation," *Montalvo*, 508 F.3d at 471 (citation omitted).

For Sea-Tac, the FAA not only approved its runways and set the precise flight paths for landing and take-off—which extend over 100 miles from Sea-Tac—but the FAA's air traffic controllers also direct the Airlines on the exact routes and orders to follow on any given day. *See generally* FAA, Third Runway ROD; FAA, Greener Skies FONSI; FAA,

Terminal Procedures Publication, Northwest at Z7-Z8, Z13-Z33, Z36, 730-78. "Except in an emergency, no person may operate an aircraft contrary to an [air traffic control] instruction[.]" 14 C.F.R. § 91.123(b). These regulations make plain the "intensive and exclusive" nature of federal control over the airspace around Sea-Tac. *City of Burbank*, 411 U.S. at 633 (citation omitted).

The Supreme Court has long held that "the pervasive control vested" in the FAA to regulate "airspace management," including through "a variety of regulations relating to takeoff and landing procedures and runway preferences," "leave[s] no room for . . . local controls." *City of Burbank*, 411 U.S. at 627, 638. In *City of Burbank*, the Supreme Court ruled that a city ordinance limiting takeoffs from a local airport to reduce noise pollution was barred by field preemption because it would "severely limit the flexibility of FAA in controlling air traffic flow." *Id*. at 639. "[T]o exclude the aircraft noise from the Town," the Supreme Court explained, "is to exclude the aircraft," which would flout the FAA's authority over "airspace management" and be utterly inconsistent with the "pervasive . . . scheme of federal regulation" of airspace. *Id.* at 627-28, 633.

58

This Court has likewise held that "the federal government ha[s] preempted the field of 'airspace management,'" which broadly includes "airspace control and facilities," "the movement of aircraft," and the "forbidden, exclusively federal areas" of "flight paths, hours, [and] altitudes." *Gianturco*, 651 F.2d at 1311; *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 809 (9th Cir. 2009); *Skysign Int'l, Inc. v. City & County of Honolulu*, 276 F.3d 1109, 1117 (9th Cir. 2002); *see also, e.g.*, *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 92 (2d Cir. 1998) ("law controlling flight paths through navigable airspace is completely preempted"); *French v. Pan Am Exp., Inc.*, 869 F.2d 1, 6 (1st Cir. 1989) ("[t]he regulation of interstate flight" is preempted).

In *Gianturco*, this Court relied on *Burbank* to hold that a state-imposed "curfew" on takeoffs and landings "impinge[d] on airspace management," a federally occupied field, "by directing when planes may fly in the San Diego area." 651 F.2d at 1316. Other courts have reached the same conclusion when confronted with state and local attempts to regulate noise and air pollution caused by aircraft taking off and landing. *See Bryski v. City of Chicago*, 499 N.E.2d 162, 167 (Ill. Ct. App. 1986) ("As plaintiffs' claims in nuisance and trespass [for noise and air pollution

59

caused by aircraft going to and from O'Hare] are based completely upon the inflight operation of aircraft, they necessarily interfere with the Federal regulation of airspace management and are preempted by Federal law under *Burbank*."); *United States v. City of Blue Ash*, 487 F. Supp. 135 (S.D. Ohio 1978) (local attempts to regulate flight paths to reduce noise pollution field preempted under *Burbank*), *aff'd*, 621 F.2d 227 (6th Cir. 1980).

"[L]etting the States . . . in on the planning" of airspace management would "diffuse the powers given by Congress to FAA and EPA" and cannot be reconciled with "[f]ederal control." *City of Burbank*, 411 U.S. at 633, 640 (citation omitted). "Congress could not reasonably have intended an airline on a Providence–to–Baltimore–to–Miami run to be subject to certain requirements in, for example Maryland, but not in Rhode Island or in Florida." *Montalvo*, 508 F.3d at 473. A "patchwork of state laws . . . would create a crazyquilt effect," *id.* (citation omitted), "undermining the legislative goal of ensuring uniformity" and interfering with the FAA's "authority to serve as the principal arbiter" of flight safety, *Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014); *see French*,

60

869 F.2d at 6 ("The regulation of interstate flight . . . must of necessity be monolithic. Its very nature permits no other conclusion.").

For these reasons, as this Court explained in *Montalvo*—where claims that airlines failed to warn about the dangers of blood clots on flights were held preempted—the FAAct "preempts the entire field of aviation safety from state and territorial regulation." 508 F.3d at 468. That reasoning applies with even greater force to flight paths, which are the core of aviation safety because they quite literally prevent collisions.

### 2. Plaintiffs' Claims Fall Squarely Within The Federally Occupied Field Of Airspace Management And Are Therefore Preempted.

The gravamen of Plaintiffs' claims is that by following "flight paths" below 3,000 feet in and out of Sea-Tac, the Airlines have harmed Plaintiffs' surrounding properties in violation of state law. *See* ER-41-44, 48, 59 (¶¶ 1-10, 27, 59, 61); *supra* pp. 14-18. But those flight paths and altitudes, along with the siting of the airport and runways, are controlled by the FAA, *see supra* pp. 5-11, which is why courts have consistently "declared preempted" "[c]laims regarding airspace management" like those here, *Martin*, 555 F.3d at 809; *see supra* pp. 56-60.

61

Plaintiffs' state-law claims fall within the same field that the Supreme Court and this Court have already found occupied by the federal government. *City of Burbank* and *Gianturco*, which the district court failed to address, control this case. As with aircraft noise, to limit or exclude aircraft emissions would be to limit or exclude the aircraft, impinging on the FAA's authority to manage the Seattle airspace. *City of Burbank*, 411 U.S. at 628*; see Gianturco*, 651 F.2d at 1312. Plaintiffs may not intrude on an area exclusively controlled by the federal government "under the guise of state law." *Ventress*, 747 F.3d at 722.

Although state tort remedies may still exist in a preempted field, they can survive only where they allege a violation of the governing standard of care prescribed by federal law. *See Martin*, 555 F.3d at 809, 811. Thus, to bring a claim in the federally occupied field of airspace management, Plaintiffs must allege a violation of federal law, which they have not done. *Cf. Nacarino v. Kashi Co.*, 77 F.4th 1201, 1204, 1211-12 (9th Cir. 2023) (where state law is preempted unless "identical" to federal law, plaintiff must "allege that Defendants failed" to comply with federal law to avoid preemption).

Plaintiffs cannot save their claims by contending that they merely seek to impose damages or request on-the-ground remediation. *See* ER-88-89. As discussed, a "tort judgment" is meant to "govern[] conduct," *Riegel*, 552 U.S. at 324 (citation omitted), and Defendants, if held liable, would therefore be "expected to modify" their behavior to avoid the conduct at issue here going forward, *Law*, 114 F.3d at 910; *see supra* pp. 47-48; *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (rejecting exceptions from preemption for state-law tort claims and concluding that "state 'regulation can be . . . effectively exerted through an award of damages'" (quoting *Garmon*, 359 U.S. at 247)).

A court need not order the Airlines to alter their flight paths or flight frequency to regulate that conduct. Imposing damages on the Airlines based on state-law claims for alleged harms "caused . . . by [aircraft] taking off and landing at Sea-Tac," ER-44, would lead to the same preempted result.

### 3. The District Court Erred By Rejecting Field Preemption.

The district court declined to dismiss Plaintiffs' claims under field preemption because it narrowed the regulated field to "airplane pollution and its effects on people and property," and then concluded that this nar-

63

rower field is not entirely preempted by federal law. Both parts of this reasoning were erroneous. Whether the field is broadly or narrowly defined, the district court's conclusion that federal law does not occupy the field is impossible to reconcile with controlling precedent.

**a.** The district court narrowed the field to "airplane pollution" "because Plaintiffs allege that they were harmed by pollution from airplanes." ER-31. But field preemption is not assessed based on the *labels* Plaintiffs attach to their claims; what matters is the "*conduct*" that their claims seek to regulate. *Arizona*, 567 U.S. at 399 (emphasis added). Indeed, in the analogous context of noise pollution from aircraft, the Supreme Court and this Court construed the applicable field as "airspace management" where local laws sought to address noise pollution by regulating the timing of flights. *City of Burbank*, 411 U.S. at 627, 635; *Gianturco*, 651 F.2d at 1311, 1316. Here, because Plaintiffs' objections to aircraft emissions similarly would regulate flight paths and frequency, the relevant field is airspace management. The district court did not even cite these dispositive precedents, much less acknowledge their direct application here.

The district court further erred by finding it "insufficient" "to say that the FAA[ct] preempts Plaintiffs' claims because they 'involve' broad categories of federally regulated activity." ER-31. That the applicable federal regulations cover, in great "density and detail," vast swaths—if not every aspect—of Defendants' flight operations is precisely why Plaintiffs' claims are barred by field preemption. *Nat'l Fed'n of the Blind*, 813 F.3d at 734. The district court failed to engage with any of the myriad federal orders and regulations that comprehensively govern flight paths, approaches, and air traffic control. *See supra* pp. 5-11. While the field must be defined with "specificity," ER-31 (quoting *Nat'l Fed'n of the Blind*, 813 F.3d at 734), that must be done by reference to the *federal* regulations, not the *state* claims. The district court was wrong to think otherwise.

**b.** Even if the field were limited to aircraft emissions, the district court erred in failing to hold that Plaintiffs' claims fall within that federally regulated field. Aircraft emissions standards are exclusively set by the EPA and enforced by the FAA for reasons of national (and international) uniformity, and the purported emissions come from aircraft and aircraft engines whose design, construction, maintenance, performance,

65

and fueling are meticulously regulated, inspected, and certified by the FAA. *See supra* pp. 11-14; 42 U.S.C. §§ 7571(a)-(b), 7572(a); 49 U.S.C. §§ 44702, 44704, 44714(1); 14 C.F.R. §§ 21.1-.700.[15]

Against this extensive regulatory backdrop, the Supreme Court has recognized that Congress "pre-empted the field so far as emissions from airplanes are concerned." *Washington v. Gen. Motors Corp.*, 406 U.S. 109, 115 (1972). Although the district court dismissed *Washington* as "dicta," ER-32, even if a "statement was dictum," this Court "do[es] not lightly decline to follow a clear statement by the Supreme Court." *Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025). Considering the bevy of EPA and FAA regulations governing aircraft emissions and aircraft engine design, the Supreme Court's statement in *Washington* is plainly correct.

---

[15] In regulating aircraft emissions, the EPA has consistently promulgated standards that match the standards set by the United Nations' International Civil Aviation Organization ("ICAO"), which the United States is required to adhere to under the Convention on International Civil Aviation. While balancing the interests of air quality, safety, noise, and efficiency, the EPA has repeatedly found those international standards to be "reasonable and appropriate," giving "significant weight to the United States' treaty obligations" and the importance of "uniformity in international aviation regulations and standards," which "helps prevent barriers in the global aviation market." 87 Fed. Reg. at 72,324-25.

The district court rested its contrary conclusion on *Navy*—which dealt with state regulation of *buildings* housing aircraft test engines under the CAA, 624 F.2d at 888—and erroneously read it to sanction some state regulation of aircraft engine emissions themselves. ER-31. But as explained, *supra* pp. 51-54, that view is unsupported by any fair reading of *Navy*. Far from it, *Navy* favorably cited a passage of the underlying district-court opinion stating that "[t]his Court does not, of course, dispute the fact that *Congress has clearly and pervasively preempted the field of aircraft emissions.*" 431 F. Supp. at 1288 (emphasis added); *see* 624 F.2d at 888. And this Court recognized that any state regulation "of" or "affect[ing]" aircraft or "the [aircraft] engines themselves" is "prohibited," 624 F.2d at 888, rebutting the district court's reliance on the decision to find a role for the States in this domain.

## C.    Plaintiffs' Claims Are Barred By Conflict Preemption.

Plaintiffs' claims are separately preempted because they "conflict with federal law." *Arizona*, 567 U.S. at 399. Like field preemption, conflict preemption can stem from federal agency regulations, *City of New York v. FCC*, 486 U.S. 57, 64 (1988), and it applies even when the state standard "attempts to achieve one of the same goals as federal law," *Ari-*

*zona*, 567 U.S. at 406. Conflict preemption is especially appropriate where, as here, the conduct at issue involves "uniquely federal areas of regulation." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 604 (2011).

**1.** It would be "impossible" for Defendants to continue flights, avoid liability for Plaintiffs' claims, and "comply with . . . federal law" regarding flight paths. *Mut. Pharm.*, 570 U.S. at 480, 486-87 n.3. As discussed, Defendants are subject to detailed and pervasive FAA regulations and orders that direct every aspect of the Airlines' flight paths in and out of Sea-Tac. *See supra* pp. 5-9. But if Plaintiffs were to prevail, to avoid future liability, Defendants would need to alter their flight paths, take-offs, and landings, which is "impossible." *Arizona*, 567 U.S. at 400. If the Airlines "independently changed" their flight paths and altitudes "to satisfy their state-law duty, they would . . . violate[] federal law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011).

Plaintiffs may not "turn impossibility into possibility" by suggesting Defendants comply with both federal- and state-law standards by paying damages. *Mut. Pharm.*, 570 U.S. at 487 n.3. When conduct is authorized by federal law, Defendants cannot be forced to "pay to play" under state

law. *See id.* ("foreclos[ing] any argument that impossibility [preemption] is defeated by the prospect that a manufacturer could 'pa[y] the state penalty' for violating a state-law duty" (quoting *PLIVA*, 564 U.S. at 622)).

Nor may Plaintiffs avoid preemption by requiring Defendants to reduce their federally authorized and controlled usage of Sea-Tac. Requiring withdrawal "from the market in order to comply with both state and federal law" would "render impossibility pre-emption a dead letter." *Mut. Pharm.*, 570 U.S. at 475. Plaintiffs' state-law claims are therefore preempted insofar as they require Defendants to adjust flight paths in violation of federal law or to be subject to damages for noncompliance with state law.

**2.** Finally, any argument that Defendants nonetheless could modify the design of their aircraft or engines to avoid state-law liability would also be preempted because it "poses a sufficient obstacle to the full accomplishment" of the EPA's and FAA's carefully balanced regulatory schemes governing aircraft emissions and design, in addition to raising impossibility problems. *Cohen v. Apple Inc.*, 46 F.4th 1012, 1029 (9th Cir. 2022).

At the outset, even assuming it was possible to create cleaner planes that comply with FAA's stringent design requirements—which Plaintiffs do not allege—the Airlines could not obtain redesigned aircraft overnight. Because new aircraft must go through an extensive testing and certification process with the FAA, *see supra* pp. 11-13, it would take years for such aircraft to come to market, allowing the Airlines to obtain and use them. In the interim, to avoid state-law liability and comply with federal certification requirements, the Airlines would be forced to withdraw from the market—an outcome that is barred by preemption. *See Mut. Pharm.*, 570 U.S. at 475.

Regardless, Plaintiffs' claims present an intolerable obstacle to the federal regulation of emissions. Pursuant to Congress's direction, the EPA and FAA balance competing policy considerations when issuing aircraft emission regulations, including air quality, public health and welfare, safety, noise, national defense, competition, and the encouragement of new technology. *See* 42 U.S.C. § 7571(a)(2)(A), (B)(ii), (c); 49 U.S.C. §§ 40101(c)-(e), 44701(a). The agencies must also account for the United States' international obligations: As a member of ICAO, the United States strives to "secure the highest practicable degree of uniformity" in

international aviation rules to afford the global public "similar levels of protection for safety and human health and the environment" wherever and however they fly, 87 Fed. Reg. at 72,314, and the United States is treaty-bound to inform ICAO of any differences between its own standards and ICAO's, *see* Convention on International Civil Aviation, art. 38, 4 Apr. 1947, 15 U.N.T.S. 296.

Allowing Plaintiffs to invoke state law to impose different emissions or aircraft design standards would pose an obstacle to the EPA's and FAA's decisions to prioritize national and international uniformity. Letting state law "impose a different [aircraft emission] standard"—one based on a "re-balancing" of the potentially conflicting policies—would render the EPA's and FAA's "statutorily mandated balancing essentially meaningless." *Cohen*, 46 F.4th at 1029, 1031 (citation omitted).

## CONCLUSION

This Court should reverse the district court's order and instruct that the motions to dismiss be granted.

Dated:  August 11, 2025

Respectfully submitted.

*/s/ Daniel W. Nelson*

David Balser
Paul J. Watford
David Willingham
Arwen R. Johnson
Madison H. Kitchens
Kelly Perigoe
KING & SPALDING LLP
11180 Peachtree St., NE
Atlanta, GA 30309
(404) 572-4600

Daniel W. Nelson
Amir C. Tayrani
Stacie Fletcher
Jessica L. Wagner
Joseph Edmonds
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
dnelson@gibsondunn.com

Malaika M. Eaton
Gregory J. Hollon
MCNAUL EBEL NAWROT &
HELGREN PLLC
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816

*Attorneys for Appellant Delta Air Lines, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## FORM 8.
## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number** 23-5830

I am the attorney for Appellant Delta Air Lines, Inc.

**This brief contains 13,882 words,** including 83 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

**Signature:**   */s/ Daniel W. Nelson*

**Date:**        August 11, 2025