*SEATTLE No. 25-2830*

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

PORT OF SEATTLE, ALASKA AIR GROUP, AND DELTA AIR LINES INC.,

*Appellants*,

v.

CINDY CODONI, MICHELE GEER, HORACE CATHCART, AMY FRANCE, AND TAMARA CHAKOS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Appellees*.

---

On Appeal from the United States District Court
for the Western District of Washington
No. 2:23-cv-795-JNW (Hon. Jamal N. Whitehead)

---

## OPENING BRIEF BY APPELLANT THE PORT OF SEATTLE

---

BETH GINSBERG
beth.ginsberg@stoel.com
RITA V. LATSINOVA
rita.latsinova@stoel.com
VANESSA SORIANO POWER
vanessa.power@stoel.com
MAREN NORTON
maren.norton@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900

*Attorneys for Appellant Port of Seattle*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

I.     INTRODUCTION .......................................................................1

II.    JURISDICTIONAL STATEMENT ................................................3

III.   ISSUE PRESENTED .....................................................................4

IV.    STATUTORY AND REGULATORY AUTHORITIES ..............................4

V.     STATEMENT OF THE CASE ......................................................4

       A.     Factual Background and Procedural History .......................................4

       B.     Statutory and Regulatory Background .................................................8

              1.     The Clean Air Act and EPA Aircraft Emission Standards ........8

              2.     The FAA's Regulation of Aircraft Operations and the
                     Public-Use Airport Improvements ...........................................10

VI.    SUMMARY OF THE ARGUMENT .........................................................14

VII.   STANDARD OF REVIEW .......................................................17

VIII.  ARGUMENT ............................................................................18

       A.     Express Preemption – the Clean Air Act ...........................................20

       B.     Express Preemption by the Airline Deregulation Act (ADA). ..........28

       C.     Implied Preemption by the FAAct and the Related Regulations
              and Orders .......................................................................32

IX.    CONCLUSION...........................................................................42

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Wolens*,
513 U.S. 219, 115 S. Ct. 817 (1995)....................................................29

*Arizona v. United States*,
567 U.S. 387, 132 S. Ct. 2492 (2012)................................................32

*Barnett Bank of Marion Cnty., N.A. v. Nelson*,
517 U.S. 25, 116 S. Ct. 1103 (1996)..................................................18

*California v Dep't of Navy*,
624 F.2d 885 (9th Cir. 1980) ...........................................7, 15, 26, 27

*Carrington v. City of Tacoma, Dep't of Pub. Utilities*,
276 F. Supp. 3d 1035 (W.D. Wash. 2017) ........................................33

*Charas v. Trans World Airlines, Inc.*,
160 F.3d 1259 (9th Cir. 1998) ...........................................................30

*Cipollone v. Liggett Grp. Inc.*,
505 U.S. 504, 112 S. Ct. 2608 (1992).....................15, 18, 19, 24, 25

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624, 93 S. Ct. 1854 (1973)....................2, 33, 34, 39

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021) ................................................................19

*City of New York v. FCC*,
486 U.S. 57, 108 S. Ct. 1637 (1988)...........................................32, 33

*Cohen v. Apple Inc.*,
46 F.4th 1012 (9th Cir. 2022) ...............................................40, 41, 42

*Cohen v. ConAgra Brands, Inc.*,
16 F.4th 1283 (9th Cir. 2021) ...........................................................17

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363, 120 S. Ct. 2288 (2000)................................................42

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658, 113 S. Ct. 1732 (1993)................................................................22

*Dilts v. Penske Logistics LLC*,
769 F.3d 637 (9th Cir. 2014) ...........................................................................28

*Duncan v. Nw. Airlines, Inc.*,
208 F.3d 1112 (9th Cir. 2000) .............................................................30, 31, 32

*EagleMed LLC v. Cox*,
868 F.3d 893 (10th Cir. 2017) .........................................................................28

*Engine Mfrs. Ass'n v. EPA*,
88 F.3d 1075 (D.C. Cir. 1996).........................................................................20

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246, 124 S. Ct. 1756 (2004)..............................................................22

*Farina v. Nokia, Inc.*,
625 F.3d 97 (3d Cir. 2010) ..............................................................................40

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141, 102 S. Ct. 3014 (1982)..............................................................32

*Freightliner Corp. v. Myrick*,
514 U.S. 280, 115 S. Ct. 1483 (1995)..............................................................19

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861, 120 S. Ct. 1913 (2000)....................................................18, 24, 32

*Greenberg v. Target Corp.*,
985 F.3d 650 (9th Cir. 2021) ...........................................................................17

*Hickcox-Huffman v. US Airways, Inc.*,
855 F.3d 1057 (9th Cir. 2017) .........................................................................17

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707, 105 S. Ct. 2371 (1985)........................................................18, 19

*Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*,
986 F.3d 841 (9th Cir. 2021)............................................................................18

*Jackson v. Gen. Motors Corp.*,
770 F. Supp. 2d 570 (S.D.N.Y. 2011) ............................................................24

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625, 132 S. Ct. 1261 (2012)........................................................33, 40

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709, 138 S. Ct. 1752 (2018)................................................................23

*Luminant Generation Co. v. U.S. E.P.A.*,
675 F.3d 917 (5th Cir. 2012) ............................................................................20

*McShannock v. JP Morgan Chase Bank NA*,
976 F.3d 881 (9th Cir. 2020) ............................................................................17

*Miller v. C.H. Robinson Worldwide, Inc.*,
976 F.3d 1016 (9th Cir. 2020) ..........................................................................17

*Montalvo v. Spirit Airlines*,
508 F.3d 464 (9th Cir. 2007) ...............................................................1, 34, 39

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374, 112 S. Ct. 2031 (1992)...........................................22, 28, 29, 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. Dep't of Env't
Conservation*,
17 F.3d 521 (2d Cir. 1994) ...............................................................................22

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air
Pollution Control Dist.*,
627 F.3d 730 (9th Cir. 2010) ............................................................................21

*Nat'l Fed'n of the Blind v. United Airlines Inc.*,
813 F.3d 718 (9th Cir. 2016) ............................................................................30

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) ...............................................................16, 17, 19

*Nw. Airlines, Inc. v. Minnesota*,
322 U.S. 292, 64 S. Ct. 950 (1944).............................................................2, 33, 34

*Nw., Inc. v. Ginsberg*,
572 U.S. 273, 134 S. Ct. 1422 (2014)..........................................................29, 30

*Riegel v. Medtronic, Inc.*,
  552 U.S. 312, 128 S. Ct. 999 (2008)......................................19, 25, 26

*Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*,
  431 F. Supp. 1271 (N.D. Cal. 1977)........................................27

*Town of Fairview v. U.S. Dep't of Transp.*,
  201 F. Supp. 2d 64 (D.D.C. 2002).........................................37

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*,
  295 F.3d 918 (9th Cir. 2002) .............................................12

*United States v. Christensen*,
  419 F.2d 1401 (9th Cir. 1969) ............................................34

*United States v. Miller*,
  No. 23-824, slip op. (U.S. Mar. 26, 2025)................................24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  264 F. Supp. 3d 1040 (N.D. Cal. 2017).....................................20

*Wisconsin Cent., Ltd. v. Shannon*,
  539 F.3d 751 (7th Cir. 2008) .............................................19

**Statutes**

15 U.S.C. § 1334(c) ..........................................................24

21 U.S.C. § 360k(a)(1) .......................................................25

28 U.S.C. § 1292(b) .........................................................4, 7

28 U.S.C. § 1332(d) ...........................................................3

42 U.S.C. §§ 7401–7431 .......................................................20

42 U.S.C. § 7401(b)(1)........................................................20

42 U.S.C. § 7407(a) ..........................................................20

42 U.S.C. § 7408(a)(1)(A).....................................................20

42 U.S.C. § 7515 .............................................................21

42 U.S.C. §§ 7521–7590 .................................................................21

42 U.S.C. § 7543 ..........................................................................22

42 U.S.C. § 7543(a) ......................................................................22

42 U.S.C. § 7543(b) ......................................................................23

42 U.S.C. § 7543(d) ......................................................................23

42 U.S.C. § 7571(a)(2) ..................................................................23

42 U.S.C. § 7571(a)(2)(A) ...............................................................8

42 U.S.C. § 7571(b) .........................................................................8

42 U.S.C. § 7572(a) .........................................................................8

42 U.S.C. § 7573 .........................................................15, 22, 23, 39

42 U.S.C. §7602(z) .......................................................................20

42 U.S.C. § 7607(b)(1) ....................................................................6

U.S.C. tit. 49, subtitle VII, pt. A .................................................36

U.S.C. tit. 49, subtitle VII, pt. B .................................................36

U.S.C. tit. 49, subtitle VII, pt. D .................................................36

49 U.S.C. § 40101(a)(6) ................................................................28

49 U.S.C. § 40101(a)(12)(A) .........................................................28

49 U.S.C. § 40103(a)(1) ................................................................34

49 U.S.C. § 40103(a)(1)–(b)(1) .....................................................35

49 U.S.C. § 40103(b)(1)–(2) .........................................................35

49 U.S.C. § 40117(b)(1) ................................................................38

49 U.S.C. § 40117(b)(2) ................................................................38

49 U.S.C. § 40117(d)(2) ...........................................................38, 39

49 U.S.C. § 41713(b) ................................................................31

49 U.S.C. § 41713(b)(1) .....................................................16, 29

49 U.S.C. § 44701(a)(1) ...........................................................11

49 U.S.C. § 44704 ....................................................................11

49 U.S.C. § 44714(1) ...............................................................11

49 U.S.C. § 46110 ..............................................................passim

49 U.S.C. § 46110(c) .........................................................37, 38

49 U.S.C. § 47101(a)(8) ...........................................................35

49 U.S.C. § 47101(a)(10) .........................................................35

49 U.S.C. § 47102(26) ..............................................................36

49 U.S.C. § 47103 ....................................................................35

49 U.S.C. § 47103(a) ................................................................35

49 U.S.C. § 47104(a) ................................................................36

49 U.S.C. § 47105(b)(2)–(3) .....................................................36

49 U.S.C. § 47105(c) ................................................................37

49 U.S.C. § 47106 ....................................................................37

49 U.S.C. § 47107 ....................................................................37

49 U.S.C. § 47107(a) ................................................................37

49 U.S.C. § 47107(g) ................................................................37

1934 Communications Act .........................................................41

1969 Cigarette Smoking Act......................................................24

Airline Deregulation Act...................................................passim

Clean Air Act ...................................................................passim

CAA § 193 ..........................................................................................21

CAA § 209 ...........................................................................22, 23, 24

CAA § 209(a) ....................................................................................22

CAA § 231 ..........................................................................................27

CAA § 233 ...................................................................................passim

Class Action Fairness Act of 2005 .......................................................3

Federal Aviation Act ...................................................................passim

Federal Aviation Administration Authorization Act .............................17

Federal Food, Drug, and Cosmetic Act ...............................................17

Home Owners' Loan Act .....................................................................17

Locomotive Inspection Act..................................................................33

Pub. L. No. 101-549, § 233, 104 Stat. 2399 (1990)..........................27

**Regulations**

14 C.F.R. pt. 16 ..................................................................................37

14 C.F.R. § 13.2 ..................................................................................37

14 C.F.R. § 16.247 ..............................................................................37

14 C.F.R. § 21 .....................................................................................11

14 C.F.R. § 21.21(b)(1).......................................................................11

14 C.F.R. § 25 .....................................................................................11

14 C.F.R. § 25–26 ...............................................................................11

14 C.F.R. § 25.951-.1001.....................................................................11

14 C.F.R. § 33–34 ...............................................................................11

14 C.F.R. § 34 ..................................................................................8, 9

14 C.F.R. § 34.60 ....................................................................................9

14 C.F.R. § 43.1–.17 ............................................................................12

14 C.F.R. § 71 ......................................................................................10

14 C.F.R. § 91-97 .................................................................................10

14 C.F.R. § 91.153-.183 .......................................................................10

14 C.F.R. § 121.91-.107 .......................................................................10

14 C.F.R. § 121.189 .............................................................................10

14 C.F.R. § 121.229-.235 .....................................................................11

14 C.F.R. § 121.361-.380 .................................................................11, 12

14 C.F.R. § 121.555 .............................................................................10

14 C.F.R. § 121.639-.647 .....................................................................11

14 C.F.R. § 121.657-.661 .....................................................................10

14 C.F.R. § 121.1101-.1119 .............................................................11, 12

14 C.F.R. § 125 ....................................................................................11

14 C.F.R. § 139 ...............................................................................35, 36

14 C.F.R. § 150–169 ............................................................................12

14 C.F.R. § 151.3 .................................................................................35

14 C.F.R. § 151.3(a) .............................................................................35

14 C.F.R. § 158.15 ...............................................................................38

40 C.F.R. § 87 ...................................................................................8, 9

40 C.F.R. § 1031 ...............................................................................8, 9

40 C.F.R. § 1031.140 ............................................................................9

47 Fed. Reg. 58462 (Dec. 20, 1982) ......................................................8

62 Fed. Reg. 25356 (May 8, 1997) ........................................................8

68 Fed. Reg. 28784, 28776 (May 2, 2003) ......................................28

79 Fed. Reg. 18755 (Apr. 3, 2014) ...........................................13, 37

85 Fed. Reg. 34326 (June 3, 2020) ...................................................28

87 Fed. Reg. 72312 (Nov. 23, 2022)...........................................9, 21

88 Fed. Reg. 7772 (Feb. 6, 2023) ..............................................14, 39

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ...........................................................3, 18

**Other Authorities**

FAA, Advisory Circular 150/5300-13B (Aug. 16, 2024).................35, 36

FAA, Advisory Circular 150/5370-10H (Dec. 21, 2018).................35, 36

FAA, Airport Improvement Program (AIP) Grant Histories,
https://www.faa.gov/airports/aip/_histories) ......................................13

FAA, Airports PFC Program Assurances (2007),
https://www.faa.gov/sites/faa.gov/files/airports/pfc/pfc-
assurances.pdf ................................................................................38

FAA, *ARP SOP 5.00 - NEPA Documented CatEx, International
Arrivals Facility*, Attachment E at 5 (May 5, 2015), published in
Appendix 2 to Port of Seattle, *Adoption of Existing Environmental
Document: Seattle-Tacoma International Airport (STIA):
International Arrivals Facility* (May 5, 2015),
https://www.portseattle.org/sites/default/files/2018-
03/IAF_SEPA_Supplemental_Checklist_SIGNED.pdf............................13, 14

FAA, *Final Environmental Assessment for Greener Skies Over
Seattle; Proposed Arrival Procedures to Seattle-Tacoma
International Airport* 1–2 (Oct. 31, 2012), .
https://www.faa.gov/sites/faa.gov/files/air_traffic/environmental_
issues/ared_documentation/ea_SEA_GreenerSkies_Vol1_FONSI_
ROD_.pdf................................................................................10, 11

FAA Office of Airports, *Passenger Facility Charge Decisions - January 2017 through December 2017* ., www.faa.gov/sites/faa.gov/files/2023-01/PFC-Decisions-Online-2017.pdf ................................................................................14

FAA, Order No. 1050.1F §§ 3-1.2, 4-1 (July 16, 2015), https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_F.pdf ................................................................................12

FAA, Order No. 1050.1G (June 30, 2025), . https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/document.current/documentNumber/1050.1 ................................12

FAA, Order No. 8130.2K - Airworthiness Certification of Aircraft (Aug. 28, 2024), https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/document.information/documentID/1043002 ................................11

FAA, Order No. JO 7400.2R (Feb. 20, 2025) ........................................36

FAA, *Passenger Facility Charge Decisions - January 2017 through December 2017* ., www.faa.gov/sites/faa.gov/files/2023-01/PFC-Decisions-Online-2017.pdf ................................................................39

FAA, *U.S. Terminal Procedures Publication*, Northwest Z13-Z36; 731-79 (June 12, 2025), . https://aeronav.faa.gov/upload_313-d/terminal/2025-06-12/NW1.pdf ................................................10

FAA, Record of Decision for the Master Plan Update Development Actions Sea-Tac International Airport, Seattle, Washington 23 (July 3, 1997), . https://www.faa.gov/sites/faa.gov/files/airports/environmental/environmental_documents/rod_seattle.pdf ................................12

# I.    INTRODUCTION

"The uniqueness of the aviation industry … mandates the need for a centralized authority. … Regulation on a national basis is required because air transportation is a national operation."  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007).  The Seattle-Tacoma International Airport ("SEA" or "Airport") is no exception.  It operates nationally and internationally under a multitude of federal laws, regulations and orders.  The lawsuit below does not allege that the Airport's owner and operator, the Port of Seattle ("Port"), failed to comply with any of them.  It targets SEA's operations *despite* the Port's unquestioned federal compliance, by asserting state-law tort claims that fault the Airport's federally *compliant* activity.  This novel theory fails.  "'[A] patchwork of state laws in [the national] airspace … would create a crazyquilt effect'" that is an "anathema" to the centralized federal authority over aviation Congress intended. *Id*. (citation omitted).

Plaintiffs sued Alaska Air Group ("Alaska"), Delta Air Lines, Inc. ("Delta") (collectively, the "Airlines") and the Port claiming that emissions from aircraft flying to and from the Airport damaged their property and caused increased health risks.  They seek to represent hundreds of thousands of individuals who live or own property within five miles of SEA and link their alleged injuries to increased flight frequencies, mandated flight paths and approaches, and various infrastructure

improvements at SEA. All of those actions, however, were either prescribed by or approved through orders issued by the Federal Aviation Administration ("FAA"). Plaintiffs do not allege that the Port is in violation of any of these orders. Instead, they claim that the so-called "externalities" of federally prescribed and legally compliant flight activity and Airport operations constitute "negligence," "nuisance," "battery," "trespass," and "inverse condemnation" and seek massive damages and other relief under state tort law. ER-43–44 at ¶¶ 7, 8.

But Plaintiffs' state-law claims are preempted. Congress recognized the national responsibility for regulating air commerce, *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303, 64 S. Ct. 950 (1944) (Jackson, J., concurring) and established pervasive federal control over air commerce that is both "intensive and exclusive." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633, 93 S. Ct. 1854 (1973) (quoting *Nw. Airlines,* 322 U.S. at 303). Planes do not "wander about in the sky like vagrant clouds" but move "only by federal permission" following "an elaborate and detailed system" of federal controls. *City of Burbank,* 411 U.S. at 633–34 (quoting *Nw. Airlines*, 322 U.S. at 303); their "privileges, rights, and protection . . . [are] owe[d] to the Federal Government alone and not to any state government," *Nw. Airlines*, 322 U.S. at 303 (Jackson, J., concurring).

Congress vested the regulation of all aspects of flight and Airport operations exclusively in the FAA and the Environmental Protection Agency ("EPA") under a

suite of federal statutes including the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA") and the Clean Air Act ("CAA"). These agencies acted within their exclusive delegated powers to enact comprehensive regulations and orders addressing the aircraft emissions resulting from the flight paths, frequencies, and altitudes Plaintiffs put at issue. The FAA also acted within its regulatory authority to plan and approve the construction of the third runway and SEA's International Arrivals Facility ("IAF") that Plaintiffs target.

The pervasive and exclusive federal regulation of the activities Plaintiffs single out leaves no room for state tort claims. If allowed, such claims would disrupt the centralized federal regulation of the nation's airspace and public airports and create an unworkable "crazyquilt" patchwork of competing local regimes contrary to the Supremacy Clause and congressional design. Plaintiffs' claims are preempted and should be dismissed.

## II. JURISDICTIONAL STATEMENT

The district court had jurisdiction over the case below under 28 U.S.C. § 1332(d), as amended by the Class Action Fairness Act of 2005, because (i) there are an estimated 300,000 putative class members, (ii) the aggregate amount in controversy is over $5 million exclusive of interest and costs; and (iii) minimum diversity is satisfied because named Plaintiffs are Washington residents and defendant Delta Airlines is a Delaware corporation with its principal place of

business in Georgia.[1]  The district court certified, and this Court accepted, the

present appeal from the denial of Defendants' motions to dismiss under 28 U.S.C.

§ 1292(b).  ER-34–36, ER-92.

### III.   ISSUE PRESENTED

Whether the district court erred by failing to dismiss Plaintiffs' state tort-law

claims against the Port, which does not own or operate aircraft that use SEA's

runways or generate emissions to which the Plaintiffs attribute their harm,

(1) as expressly preempted by Section 233 of the CAA, and/or

(2) as expressly preempted by the ADA; and/or

(3)  as impliedly preempted by the FAA regulations and orders that address
every aspect of flight operations (e.g., runway layout, flight paths,
frequencies, approaches and altitudes), and by the FAA's unchallenged
approval of the infrastructure improvements (third runway and the IAF) at
SEA.

### IV.   STATUTORY AND REGULATORY AUTHORITIES

The relevant statutory and regulatory authorities appear in the Addendum to

this brief.

### V.   STATEMENT OF THE CASE

#### A.   Factual Background and Procedural History

This class action was commenced in 2023 on behalf of putative classes of

residents and property owners (numbering hundreds of thousands of people) within

---

[1]  The district court's subject-matter jurisdiction is contested based on the collateral
attack argument discussed in Delta's brief, joined by the Port.

a five-mile radius of SEA. *See generally* Second Amended Complaint ("SAC"),
ER-37–91. The named Plaintiffs allege that they were harmed by emissions from
aircraft flying over their properties while taking off and landing at SEA on
federally prescribed flight paths and at altitudes dictated by the FAA. ER-41–44.
Without pleading that either the Airlines or the Port, which owns the Airport, have
violated any of the myriad federal laws and regulations governing flight operations
at SEA, Plaintiffs allege that they are entitled to injunctive relief in the form of
medical monitoring, remediation costs for alleged property damage, and
compensation for the diminution of the value of their homes. ER-88–89. The tort
claims they bring include negligence, nuisance, and trespass against all
Defendants, as well as a battery claim against the Airlines and an inverse
condemnation claim against the Port. ER-82–88.

Plaintiffs assert that planes flying at altitudes lower than 3,000 feet release
emissions that contaminate properties below the flight paths and expose residents
to "significant . . . air pollution." ER-59 at ¶ 61. *See also* ER-42 at ¶ 4, ER-55 at
¶ 50, ER-58–61 at ¶¶ 53-64, ER-63 at ¶ 67 n.9. While conceding that their
concerns are not unique to SEA (ER-65–66 at ¶¶ 71,73-74 (citing studies of ultra
fine particulate emissions at airports around the world)), Plaintiffs claim that
communities below flight paths and underneath and downwind of flying aircraft
are at a higher risk of exposure to emissions. ER-58 at ¶ 57. They further claim

that their residences and/or properties have been contaminated by these emissions. ER-45 at ¶ 16, ER-58–60 at ¶¶ 57, 59, 61, 64. Plaintiffs assert that their alleged injuries stem from the flight routes and increased frequency of flights above their homes and blame the Port for constructing a third runway that became operational in 2008, and the IAF that opened in 2022. ER-53 at ¶ 41.

The Airlines and the Port moved to dismiss all claims. ER-107 at Dkts. 49, 50. They argued that Plaintiffs' claims are an impermissible collateral attack on numerous orders issued by the FAA and the EPA that (i) approved the construction of the third runway and the IAF at SEA and (ii) established the flight paths and emission and manufacturing standards that apply to all aircraft flying in and out of the Airport. The agency orders that govern how airlines and airports operate are only reviewable in the courts of appeal. *See* 49 U.S.C. § 46110 (review of FAA orders); 42 U.S.C. § 7607(b)(1) (review of EPA orders). Defendants also argued that Plaintiffs' claims are expressly preempted by the CAA and the ADA and impliedly preempted by field and conflict preemption.

The Honorable Jamal N. Whitehead of the Western District of Washington denied the motions to dismiss on November 25, 2024. ER-4–33. While conceding that case law limits the jurisdiction of the district court barring it from hearing damages claims that are inescapably intertwined with FAA orders, the court thought it was premature to conclude that Plaintiffs' state-law claims are

"inescapably intertwined with the review of a particular agency order." ER-17. Although Plaintiffs made no allegations to the contrary, the district court concluded that it could not decide whether the Airlines had complied with agency orders on the record before it and rejected the collateral-attack doctrine as a basis for dismissal. ER-18.

The district court rejected express preemption for similar reasons. With respect to the CAA, the district court stated, relying on *California v Dep't of Navy* ("*Navy*"), 624 F.2d 885, 888 (9th Cir. 1980), that Plaintiffs' claims may be preempted if they necessitated aircraft engine alterations, which the court declined to decide on the present record. ER-28. The district court similarly rejected the ADA express preemption argument as requiring further factual development. ER-27. Construing the relevant field as "airplane pollution and its effects on people and property" rather than airspace management, aviation safety and aircraft engine and body design, the district court then rejected the field and conflict preemption arguments. ER-31, ER-33.

On February 18, 2025, the district court granted Defendants' motion for certification under 28 U.S.C. § 1292(b), agreeing that reasonable minds could differ on the various jurisdictional and case-dispositive aspects of his ruling and finding that the criteria for interlocutory review were satisfied. ER-34–36. The court also found that this case implicates important issues concerning federal

aviation regulation and the scope of state-law tort remedies affecting airline operations and certified the case for interlocutory review on that basis as well. ER-35. This Court accepted this interlocutory appeal on May 1, 2025. ER-92.

## B. Statutory and Regulatory Background

### 1. The Clean Air Act and EPA Aircraft Emission Standards

In passing the CAA, Congress vested EPA with authority to issue "emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in [its] judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A). To evaluate the technological feasibility of such standards and the cost of compliance (among other factors) Congress directed EPA to consult with the FAA. *Id.* § 7571(b). Congress then charged the FAA with issuing regulations to ensure compliance with EPA's aircraft emission standards. *Id.* § 7572(a).

Since 1973, EPA has promulgated increasingly stringent limits for the aircraft emissions including smoke and exhaust. EPA's regulations were amended a number of times in the last 50 years and address an array of pollutants including particulate matter, hydrocarbons, carbon monoxide, and nitrogen oxides.[2] 40 C.F.R. pts. 87, 1031; *see also* 14 C.F.R. pt. 34 (FAA regulations requiring

---

[2] 47 Fed. Reg. 58462 (Dec. 20, 1982); 62 Fed. Reg. 25356, 25365 (May 8, 1997).

compliance with EPA emission standards). In promulgating these regulations, EPA aligned domestic emission standards with those that have been internationally adopted.[3] This alignment follows an international treaty on harmonization of global standards for aircraft emissions.[4] EPA devised and the FAA enforces a series of exacting testing procedures to ensure compliance with EPA's emission standards. 40 C.F.R. § 1031.140; 14 C.F.R. § 34.60.

In its most recent regulations, EPA considered the health protectiveness of federal aircraft emissions standards, including the same local studies of the health implications of airplane emissions for communities near airports that are featured in the SAC and form the basis of Plaintiffs' claims. *See* 87 Fed. Reg. 72312, 72320–24 (Nov. 23, 2022). EPA described its work to develop emissions standards in collaboration with international authorities as well as its review of 70 peer-reviewed emission studies at airports both nationally and globally. In establishing standards consistent with international law, the agency emphasized

---

[3] EPA consistently promulgates standards that are identical to those established by the United Nations' International Civil Aviation Organization [ICAO] to promote "uniformity in international aviation regulations and standards," which "helps prevent barriers in the global aviation market." 87 Fed. Reg. 72312, 72314, 72325 (Nov. 23, 2022).

[4] 87 Fed. Reg. at 72326 ("international cooperation on aircraft emissions brings substantial benefits over all to the United States;" a decision "to deviate from [ICAO standards] might well undermine future efforts by the United States to seek international consensus on aircraft emission standards").

that "passengers and the public . . . expect similar levels of protection for safety and human health and the environment regardless of manufacturer, airline, or point of origin of a flight." *Id.* at 72314, 72325.

### 2. The FAA's Regulation of Aircraft Operations and the Public-Use Airport Improvements

The FAA regulations control the flight paths of aircraft. This includes the required altitude, direction, and angles for takeoff and landing. *E.g.*, 14 C.F.R. §§ 91.153–.183, 121.91–.107, 121.189, 121.555, 121.657–.661; *see generally* 14 C.F.R. pts. 71, 91–97. SEA is no exception. Aircraft arriving at or departing from SEA must take off and land at specific angles and altitudes prescribed by the FAA in a published document that is regularly updated. *See* FAA, *U.S. Terminal Procedures Publication*, Northwest Z13-Z36; 731-79 (June 12, 2025).[5] The "routes and procedures" at SEA were adopted after the FAA analyzed their environmental and safety impacts, including the impacts on "persons and property on the ground." FAA, *Final Environmental Assessment for Greener Skies Over Seattle; Proposed Arrival Procedures to Seattle-Tacoma International Airport* 1–2

---

[5] Available at https://aeronav.faa.gov/upload_313-d/terminal/2025-06-12/NW1.pdf.

(Oct. 31, 2012) ("Greener Skies FONSI").[6]  The prescribed flight paths were designed to minimize fuel burn and reduce emissions.  *See id.* at 3.

To "promote safe flight of civil aircraft in air commerce," Congress required the FAA to pass exacting standards governing "the design, material, construction, quality of work, cybersecurity, and performance of aircraft [and] aircraft engines." 49 U.S.C. § 44701(a)(1); *e.g.*, 14 C.F.R. pts. 25–26 (airworthiness standards.); 14 C.F.R. pts. 33–34 (standards for aircraft engines and fuel systems).  And, in order to "control or eliminate aircraft emissions," which EPA "decides under section 231 of the Clean Air Act … endanger the public health or welfare," Congress required the FAA to develop "standards for the … properties of an aircraft fuel or fuel additive." 49 U.S.C. § 44714(1).  *See e.g.*, 14 C.F.R. §§ 25.951–.1001, 121.229–.235, 121.639–.647 (regulations of fuel tanks, fuel systems, and fuel supply).

To be certified "airworthy" for landing and taking off at commercial airports, new versions of commercial aircraft must meet exacting federal standards. 14 C.F.R. § 21.21(b)(1); *see also* 49 U.S.C. § 44704; 14 C.F.R. pts. 21, 25, 125; FAA, Order No. 8130.2K - Airworthiness Certification of Aircraft (Aug. 28,

---

[6]  Available at https://www.faa.gov/sites/faa.gov/files/air_traffic/environmental_issues/ared_documentation/ea_SEA_GreenerSkies_Vol1_FONSI_ROD_121030.pdf.

2024).[7]  *See also* 14 C.F.R. §§ 43.1–.17. *id.* §§ 121.361–.380, 121.1101–.1119 (maintenance regulations).[8]

The FAA reviews and approves the airport's location, design, and construction before it can operate and also reviews and approves the siting and direction of the airport runways and any expansions.  *See* 14 C.F.R. pts. 150–169. In so doing, the FAA evaluates the environmental impacts of airport operations, including the impact on air quality and the health and safety of the local community.  FAA, Order Nos. 1050.1F §§ 3-1.2, 4-1 (July 16, 2015)[9] and 1050.1G (June 30, 2025).[10]

Here, the FAA analyzed and approved both infrastructure projects Plaintiffs put at issue.  In approving the construction of SEA's third runway, the FAA concluded that its air quality impact would be "*de minimis*" and would "conform[] to the … National Ambient Air Quality Standards."  FAA, Record of Decision for

---

[7]  Available at
https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/
document.information/documentID/1043002.

[8]  The Court may take judicial notice of the FAA and EPA orders cited herein. *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002).

[9]  Available at
https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf.

[10]  Available at
https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/
document.current/documentNumber/1050.1.

the Master Plan Update Development Actions Sea-Tac International Airport,

Seattle, Washington 23 (July 3, 1997) ("Record of Decision").[11]  The FAA also

provided federal grant funds for the construction of the third runway, and in so

doing required the Port to adhere to a series of exacting grant restrictions,

including, as relevant here, commitments to (i) comply with all applicable federal

laws, (ii) remain open for all types, kinds, and classes of aeronautical activities,

and (iii) make the Airport available for public use.  *See* 79 Fed. Reg. 18755 (Apr.

3, 2014) (Airport Improvement Program (AIP) Grant Assurances).[12]  Plaintiffs

chose not to challenge the FAA's determinations in a federal court of appeals

under 49 U.S.C. § 46110.

    The FAA also concluded that SEA's new IAF would "not result in emissions

that would equal or exceed the applicable de minimis threshold rates," FAA, *ARP*

*SOP 5.00 – NEPA Documented CatEx, International Arrivals Facility*, Attachment

---

[11]  Available at
https://www.faa.gov/sites/faa.gov/files/airports/environmental/environmental_
documents/rod_seattle.pdf.

[12]  The history of FAA grants for the construction of SEA's third runway is
available at FAA, Airport Improvement Program (AIP) Grant Histories,
https://www.faa.gov/airports/aip/grant_histories (last visited July 26, 2025).  *See,
e.g., id.*, Fiscal Year 2000 AIP Summary (All Grants) at 88 of 93 ($11,624,264
awarded to construct the third runway, Phase IV); *id.*, Fiscal Year 2003 AIP
Summary (All Grants) at 78 ($17,050.000); *id.*, Fiscal Year 2008 AIP Summary
(All Grants) ($24,281,078 for runway construction, Phase 13).

E at 5 (May 5, 2015),[13] and in 2017 approved its funding through passenger facility charges.[14]  Plaintiffs again brought no challenge under 49 U.S.C. § 46110.

## VI.    SUMMARY OF THE ARGUMENT

The district court declined to dismiss Plaintiffs' claims as a collateral attack on the many FAA and EPA orders governing flight activity at SEA because it could not conclude that Plaintiffs' state-law claims "are inescapably intertwined with the review of a *particular* agency order."  ER-17 (emphasis added).  This was error.  Plaintiffs' claims are impermissibly intertwined with a wide range of agency orders that set emission standards, flight paths, approaches and altitudes—the exact aspects of flight operations that Plaintiffs allege have harmed them.  These orders can only be challenged in the courts of appeal.  The same applies to the FAA's approval of the third runway and the IAF.  49 U.S.C. § 46110.  The Port adopts the Airlines' subject-matter jurisdiction defense as an independent basis for dismissal.

The district court also erred in failing to dismiss Plaintiffs' claims as preempted by the CAA, the ADA, and the FAAct and related regulations and

---

[13]  Published in Appendix 2 to Port of Seattle, *Adoption of Existing Environmental Document: Seattle-Tacoma International Airport (STIA): International Arrivals Facility* (May 5, 2015), https://www.portseattle.org/sites/default/files/2018-03/IAF_SEPA_Supplemental_Checklist_SIGNED.pdf.

[14]  FAA Office of Airports, *Passenger Facility Charge Decisions – January 2017 through December 2017* at 46, www.faa.gov/sites/faa.gov/files/2023-01/PFC-Decisions-Online-2017.pdf.  *See also* 88 Fed. Reg. 7772 (Feb. 6, 2023).

orders. As discussed more fully below, the preemption provision in Section 233 of the CAA is explicit and categorical: no state can adopt or enforce emission standards from aircraft or their engines that are not identical to federal standards adopted by the FAA and the EPA. 42 U.S.C. § 7573. Because Plaintiffs do not allege that Defendants' flight operations at SEA violated any federal emission standards, their claims necessarily seek to subject SEA flight operations to some other, non-identical emission standards based on state law, a result Congress flatly prohibited. For preemption purposes, Plaintiffs' request for damages has the same effect as direct regulation because an obligation to pay compensation is as "potent [a] method of governing conduct and controlling policy" as an injunction. *Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 521, 112 S. Ct. 2608 (1992) (citation omitted).

In failing to follow Section 233, the district court also misconstrued *Navy*, 624 F.2d 885. *Navy* did not involve emissions from flying aircraft. Because the engines in *Navy* had been removed from the aircraft and were being tested in concrete enclosed structures on the ground, the emissions at issue could be regulated as *stationary* sources under Title I of the CAA to which Section 233 does not apply.

In addition to being preempted under Section 233 of the CAA, the claims here are also barred by the ADA, which expressly preempts state "law, regulation,

or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The district court erred by declining to reach ADA preemption as premature. ER-27. Because Plaintiffs attribute their alleged harm to the Airlines' routes and services (which this Court has defined to include schedules, origins and the provision of air transportation to and from various markets at various times), their claims fall squarely within the zone that Congress expressly preempted under the ADA. ER- 41–42 at ¶¶ 3-4, ER-44 at ¶ 8, ER-48 at ¶ 27, ER-58–59 at ¶¶ 58–59, ER-59–63 at ¶¶ 61-67.

In addition, Plaintiffs' state-law tort claims are independently field and conflict preempted by both the CAA and the FAAct. These statutes delegate to the FAA and the EPA the exclusive authority to regulate all aspects of the flight operations to which Plaintiffs attribute their alleged harm, including aircraft emissions, flight paths, altitudes, approaches, and SEA's infrastructure improvements. In promulgating regulations and issuing orders that prescribe how aircraft land and take off at SEA, the agencies balanced multiple factors required by statute, including safety, feasibility and national defense concerns. If Plaintiffs' state-law tort claims were allowed to proceed, this delicate balancing would be usurped. Similarly, an award of state-law tort damages penalizing federally compliant flight and airport operations would make the exclusive and pervasive federal regulation of the nation's airspace meaningless. That Plaintiffs seek

damages and not a new federal standard is irrelevant because "if a cause of action is displaced, displacement is extended to all remedies." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 857 (9th Cir. 2012).

The district court also erred in construing the relevant "field" for preemption purposes as "airplane pollution and its effects on people and property." ER-31. What matters is the challenged conduct, not labels. The *conduct* to which Plaintiffs attribute their harm involves flight paths/altitudes/approaches, aircraft emissions, aircraft design, and the expansion of SEA, a public-use airport. Field preemption clearly applies to this conduct, barring Plaintiffs' state-law tort claims.

## VII. STANDARD OF REVIEW

The district court's decision regarding preemption is reviewed de novo. *See Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1287 (9th Cir. 2021); *Greenberg v. Target Corp.*, 985 F.3d 650, 654 (9th Cir. 2021) (Federal Food, Drug, and Cosmetic Act); *Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1021 (9th Cir. 2020) (Federal Aviation Administration Authorization Act); *McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 886–87 (9th Cir. 2020) (Home Owners' Loan Act); *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1060 (9th Cir. 2017).

# VIII. ARGUMENT

"[T]he Laws of the United States ... shall be the supreme Law of the Land; ... any Thing in the … Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law may preempt state law expressly or impliedly. Express preemption applies where statutory language "reveals an explicit congressional intent to pre-empt state law." *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31, 116 S. Ct. 1103 (1996). When the statute "contains an express pre-emption clause," courts "do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin*., 986 F.3d 841, 853 (9th Cir. 2021) (internal quotation marks and citation omitted).

The first type of implied preemption, conflict preemption, applies when compliance with both federal and state regulations is impossible or where state law stands as an obstacle to the congressional purpose and objectives. *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 873, 120 S. Ct. 1913 (2000). The second type of implied preemption, field preemption, applies when federal law so thoroughly occupies a legislative field "as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 516 (citation omitted). For preemption purposes, federal law includes federal regulations,

*Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713, 105 S. Ct. 2371 (1985), and state law includes the common law as a basis for judgments in tort suits, *Riegel v. Medtronic, Inc*., 552 U.S. 312, 324–25, 128 S. Ct. 999 (2008).

Express and implied preemption may exist in the same statute. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289, 115 S. Ct. 1483 (1995). Both "are generally purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at issue." *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008). Because an obligation to pay compensation is as "potent [a] method of governing conduct and controlling policy" as an injunction, *Cipollone*, 505 U.S. at 521 (citation omitted), Plaintiffs' decision to seek damages instead of an injunction either abating air emissions or creating a new and more stringent emission standard does not change the preemption analysis. *Native Vill. of Kivalina*, 696 F.3d at 857 ("displacement is extended to all remedies"); *City of New York v. Chevron Corp*., 993 F.3d 81, 96 (2d Cir. 2021) ("whether styled as an action for injunctive relief against the Producers to stop them from producing fossil fuels, or an action for damages that would have the same practical effect, the City's claims are clearly barred by the Clean Air Act").

A. **Express Preemption – the Clean Air Act**

The CAA "protect[s] and enhance[s] the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In promulgating the CAA, Congress addressed different sources of air pollution in separate titles and created three different increasingly strict preemption regimes. Title I of the CAA addresses *stationary* sources of pollution, namely, "facilities such as factories and chemical plants," 42 U.S.C. §7602(z), and gave states the power to control emissions from these local facilities. 42 U.S.C. §§ 7401–7431. Under this title, EPA must both identify specific air pollutants that "may reasonably be anticipated to endanger public health or welfare," 42 U.S.C. § 7408(a)(1)(A), and establish National Ambient Air Quality Standards ("NAAQS") that the states are responsible for implementing under the doctrine of "cooperative federalism." *Luminant Generation Co. v. U.S. E.P.A.*, 675 F.3d 917, 921 (5th Cir. 2012). *See also* 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State …."); *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1078 (D.C. Cir. 1996); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 264 F. Supp. 3d 1040, 1049 (N.D. Cal. 2017) ("With respect to emissions from *stationary* sources, States still have substantial discretion to set and enforce pollution standards." (emphasis

added)).  Consistent with this model of cooperative federalism, Title I has a savings clause that preserves certain state-law claims.  CAA Section 193, 42 U.S.C. § 7515.

Unlike Title I that "gives the states the job of regulating stationary sources of pollution," under Title II "the EPA ... [is] responsible for regulating emissions from … *mobile* sources" of air pollution, namely, Motor Vehicle Emission and Fuel Standards (Part A) and Aircraft Emission Standards (Part B).  *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir. 2010) (emphasis added); 42 U.S.C. §§ 7521–7590.  *See also VW "Clean Diesel" Litig.*, 264 F. Supp. 3d at 1049 ("the regulation of motor-vehicle emissions has become 'a principally federal project'" (citation omitted)).  The reasons for the regulatory difference are self-evident.  If mobile sources, "which readily move across state boundaries," were subjected to control by individual states, "the possibility of 50 different state regulatory regimes [would] raise[] the spectre of an anarchic patchwork of federal and state regulatory programs," creating a "nightmare[] for the [car] manufacturers."  *Id.* (citation omitted).  The same applies to airplanes, which regularly move across state and international boundaries, with even greater force.  87 Fed. Reg. 72312,72326 (Nov. 23, 2022).

Given the interstate (and international) nature of mobile source emissions, Congress made express preemption of state regulation of mobile sources of

emissions "the cornerstone of Title II." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. Dep't of Env't Conservation*, 17 F.3d 521, 526 (2d Cir. 1994). The express preemption clauses in Sections 209 and 233 of Title II are broad and unambiguous. 42 U.S.C. §§ 7543, 7573.

> CAA § 209(a) provides that
>
> No State or any political subdivision thereof shall adopt or attempt to enforce *any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines* subject to this part.

42 U.S.C. § 7543(a) (emphasis added). The Supreme Court has construed the terms "standard" and "relating to" broadly to give expansive effect to this preemption clause. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 112 S. Ct. 2031 (1992) (the phrase "relating to" in the preemption clause is to be given a broad scope); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 254–55, 124 S. Ct. 1756 (2004) (interpreting the term "standard" broadly); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732 (1993) (legal duties imposed by common law fall within scope of "law, rule, regulation, order, or standard relating to railroad safety" (citation omitted)).

Congress reserved the strictest preemption language for emissions from operational aircraft under Part B of Title II, by using language that is both explicit and categorical. It delegated to EPA the exclusive authority to "issue … standards applicable to the emission of any air pollutant from any class or classes of aircraft

engines which … causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare," 42 U.S.C. § 7571(a)(2), and then unambiguously preempted all non-identical state aircraft emission standards in Section 233:

> No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part.

42 U.S.C. § 7573.

While using the same broad terms as Section 209 — "no State … may adopt or enforce," "any" standard unless "identical" to the federal one — Congress intended for preemption under Section 233 to go further. Unlike Section 209, which is limited to the control of emissions from *new* motor vehicles and engines, Section 233 applies to emissions "from *any* aircraft" or engine. (Emphasis added.) And Congress' use of the phrase "respecting" has a further "broadening effect" making the preemption provision more sweeping than preemption provisions found elsewhere in the Act. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 709–10, 138 S. Ct. 1752 (2018).

Most importantly, unlike the preemption sections found under Title I and Part A of Title II (in Section 209, 42 U.S.C. §§ 7543(b) and (d)), Section 233 has no corresponding waiver or savings clause, a "contrast in structure [that] reflects a

deliberate congressional choice." *United States v. Miller*, No. 23-824, slip op.
at 10 (U.S. Mar. 26, 2025); *see also Geier*, 529 U.S. at 868 ("The saving clause
assumes that there are some significant number of common-law liability cases to
save").

Combined with the absence of waiver or savings clauses, the categorical
preemptive language in Section 233 shows that Congress meant what it said. No
state may adopt its own standard "respecting" emissions of "any" pollutant from
"any" aircraft or engine that is non-identical to the federal standard. Nor can the
states "attempt to enforce" such standards through state-law tort claims. *Cipollone*,
505 U.S. at 515, 521–22 (by adding the phrase "[n]o requirement or prohibition
based on smoking and health shall be imposed under State law" to the 1969
Cigarette Smoking Act, 15 U.S.C. § 1334(c), Congress "plainly reach[ed] beyond
[legislative] enactments" and preempted state tort claims because common-law
liability is "premised on the existence of a legal duty," and because a tort liability
award "'is designed to be[] a potent method of governing conduct and controlling
policy'" (citation omitted)); *see also Jackson v. Gen. Motors Corp.*, 770 F. Supp.
2d 570, 575 (S.D.N.Y. 2011) (construing CAA Section 209 and finding that a tort
claim seeking damages for exposure to bus diesel fumes was "an example of a
state attempting to enforce the CAA, and is therefore subject to preemption").

The Supreme Court has repeatedly held that "[a]bsent other indication, reference to a State's 'requirements'" – or here standard – "includes its common-law duties." *Riegel*, 552 U.S. at 324 (construing similar preemption language used by Congress in the Medical Device Amendments of 1975 ("MDA") and citing *Cipollone*, 505 U.S. at 521–22).[15] Elaborating on the reason why it makes "little sense" to "exclud[e] common-law duties from the scope of pre-emption," the Supreme Court explained that a state tort claim "disrupts the federal scheme no less than state regulatory law to the same effect." *Riegel*, 552 U.S. at 324–35. In fact, state tort law "applied by juries under a negligence or strict-liability standard[] is less deserving of preservation" than state regulatory law because a state statute or regulation could "at least be expected to apply cost-benefit analysis similar to that applied by the experts at the FDA." *Id*. at 325. A jury, on the other hand, "sees only the cost of a more dangerous design, and is not concerned with its benefits; the patients who reaped those benefits are not represented in court." *Id*. Construing the terms "requirements" and "standards" interchangeably, the Court concluded that it is "implausible that the MDA was meant to 'grant greater power

---

[15] Like CAA Section 233, the broad MDA preemption clause that applies to Class III medical devices, which require FDA approval, provides that "no State … may establish or continue in effect with respect to a device … any [safety] *requirement* … which is different from, or in addition to, any requirement applicable under this chapter." 21 U.S.C. § 360k(a)(1) (emphasis added).

(to set state standards 'different from, or in addition to,' federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes." *Id*. (citation omitted).

The same rationale applies to Section 233 of the CAA. The FAA has adopted and enforces EPA emission standards for aircraft and their engines that states must follow identically and without exception. Plaintiffs do not allege that in flying in and out of SEA the Airlines have violated any of the applicable federal emission standards. Instead, they seek damages based on some unknown, non-identical standards they seek to impose based on state tort law. If successful, such tort claims would allow a jury, unilaterally, to disrupt the uniformity of federal standards, a result the Supreme Court has resoundingly rejected. *See Riegel*, 552 U.S. at 325–26. Section 233 expressly preempts such claims.

This Court's decision in *Navy*, 624 F.2d 885, does not change this result. *Navy* did not even involve emissions from a mobile source, much less emissions from flying "aircraft or their engines." The engines in *Navy* had been removed from the aircraft and were being tested in an enclosed building in their disembodied state. The ensuing emissions were from an "engine test cell," an immobile, enclosed concrete structure located on the ground. This Court held that preemption under Section 233 did not apply in that factual context because the

state regulations could be met "without affecting the design, structure, operation, or performance of the aircraft engine." *Id*. at 888.

This makes sense: California could regulate emissions from the stationary concrete structure housing the disembodied engines (the "engine test cells")—not the aircraft engines *inside* the test cells. The decision does not mean, as Plaintiffs have argued, that if a regulation does not require physical alteration of aircraft engines it is not preempted under Section 233. *Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*, 431 F. Supp. 1271, 1288 (N.D. Cal. 1977) ("This Court does not, of course, dispute the fact that Congress has clearly and pervasively preempted the field of aircraft emissions.").

In any event, regardless of how one interprets *Navy*, 624 F.2d 885, its holding is inapposite when the emissions at issue are from operational aircraft. Lest there be any doubt, following *Navy*, Congress and EPA clarified that engine test cells/stands are regulated as *stationary* emission sources under Title I of the Act, not under CAA Sections 231 and 233, which apply to emissions from flying aircraft.[16] Unlike *Navy*, this case is not about air emissions from stationary

---

[16] In 1990, Congress directed the EPA, the DOT and the Secretary of Defense to study "uninstalled aircraft engines in enclosed test cells" and investigate technologies to control some of their emissions; "[f]ollowing the completion of such study, any of the States may adopt or enforce any standard for emissions of oxides of nitrogen from test cells … in accordance with the findings of the study." Pub. L. No. 101-549, 104 Stat. 2399 (1990), note (emphasis added). In 2003, the EPA promulgated stationary source regulations of emissions from engine test cells

sources, which the states can regulate under Title I.  It is about emissions from flying aircraft, a mobile source, where "any" state "standards," including state tort claims non-identical to federal standards are expressly and categorically preempted under CAA Section 233.  For these reasons, Plaintiffs' claims are expressly preempted and should be dismissed.

## B.  Express Preemption by the Airline Deregulation Act (ADA).

In addition to being expressly preempted by CAA Section 233, Plaintiffs' claims are also expressly and independently preempted under the ADA.  Congress enacted the ADA in 1978 to promote "efficiency, innovation, and low prices" in the airline industry by preempting actions that interfere with the competitive market forces within the aviation industry.  49 U.S.C. § 40101(a)(6), (12)(A); *Dilts v. Penske Logistics LLC*, 769 F.3d 637, 646 (9th Cir. 2014) (describing purpose of the ADA), *see also EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017) (noting "the congressional purpose of 'further[ing] efficiency, innovation, and low prices' … was a motivating force behind the Airline Deregulation Act" (brackets in original) (quoting *Morales*, 504 U.S. at 378)).  The ADA includes an express

---

housing uninstalled engines based on authority conferred by Section 112 of CAA Title I.  68 Fed. Reg. 28784, 28776 (May 2, 2003) ("The final rule clarifies [the] applicability issue.  The final rule regulates the testing of engines, not the testing of any final product (e.g., automobile, boat, power generator, etc.).  If the engine being tested in a test cell/ stand is not installed in, or an integrated part of, the final product, then the test cell/stand is considered part of the affected source.").  *See also* 85 Fed. Reg. 34326 (June 3, 2020) (2020 amendments).

preemption provision to ensure that the states would not undo federal deregulation with regulation of their own. *Morales*, 504 U.S. at 378. Accordingly, no state or political subdivision may enact or enforce "a law, regulation, or other provision having the force and effect of law *related to a price, route, or service* of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1) (emphasis added).

In addition to prohibiting states from "actually prescribing rates, routes, or services," the ADA preempts state laws that have a connection with or reference to airline rates, routes or services. *Morales*, 504 U.S. at 385–87. It also preempts state laws that significantly impact Congress's deregulatory and preemption objectives. *Id.* at 385, 390. The preemption provision applies equally to states and individuals. "[N]o State ... shall ... enforce any law" means that "*no one* may enforce state law against an airline when the 'enforcement action has a connection with, or reference to, airline "rates, routes, or services."'" *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 239, 115 S. Ct. 817 (1995) (O'Connor, J., concurring) (ellipses in original; emphasis added; brackets and citation omitted). And, as with express preemption under the CAA, because "the ADA's deregulatory aim can be undermined just as surely by a state common-law rule as it can by a state statute or regulation," state common law "fall[s] comfortably within the language of the

ADA pre-emption provision." *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 281, 283, 134 S. Ct. 1422 (2014).

As used by Congress in preempting state regulation of "rates, routes, or services," the term "services" includes "access to flights." *Id*. at 284; *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) ("services" in ADA context includes regularity or frequency of flights between given destinations); *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 726 (9th Cir. 2016) ("service" refers to schedules, origins, and destinations of the point-to-point transportation of passengers, cargo, or mail—in other words, the provision of air transportation to and from various markets at various times).

In turn, "rates" and "routes" refer to the "point-to-point transport of passengers:"

> "Rates" indicates price; "routes" refers to courses of travel. It therefore follows that "service," when juxtaposed to "rates" and "routes," refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided....
>
> … Congress used "service"... to refer to the provision of air transportation to and from various markets at various times.

*Duncan v. Nw. Airlines, Inc.*, 208 F.3d 1112, 1114–15 (9th Cir. 2000) (first and third ellipses in original; brackets and citation omitted).

Plaintiffs allege that they were harmed by exposure to emissions from aircraft flying over their homes on their way to or from SEA.  SAC ¶¶ 4, 8, 41, 59.  They fault the Port for somehow "allowing" the Airlines to increase flights to and from SEA, blame the Port for constructing the third runway and the Airport's new IAF, and claim that the alleged increased flight operations disproportionately affect those in the so-called "contamination zone." *Id.* ¶¶ 41, 50, 91.  As discussed more fully below, these claims are field- and conflict-preempted by the FAA's pervasive regulation of flight operations and approval of airport improvement projects. *See infra* at 32-42.  But even assuming, *arguendo*, that these claims survived, they would be expressly preempted by the ADA.

First, Plaintiffs' claims target the "service" of flying in and out of SEA and seek damages for every property owner and resident within a five-mile radius of the Airport.  In so doing, Plaintiffs would impose a unique economic burden on flights in and out of SEA, despite the fact they artfully refrained from seeking to curtail flights.  This is far more than the "connection with" airline "rates, routes, and services" required for preemption under 49 U.S.C. § 41713(b) to apply. *Morales*, 504 U.S. at 382–84.

Second, by seeking damages for federally approved flight and airport operations at SEA, Plaintiffs' claims threaten to impact "access to flights," "schedules," and "origins and destinations of the transportation of passengers," and

thus necessarily "relate to" airline "routes and services" as construed in *Duncan*. In short, because the ADA's preemption provision prohibits Plaintiffs from interfering with the Act's deregulatory goals and exercising any control over the Airlines' choice of destination or frequency of flights in and out of SEA, Plaintiffs' claims fall squarely within its ambit and must be dismissed.

## C. Implied Preemption by the FAAct and the Related Regulations and Orders

While Congress expressly preempted the type of claims presented here under Section 233 and the ADA, the intent to preempt need not be express. *Geier*, 529 U.S. at 884–85; *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154, 102 S. Ct. 3014 (1982) ("A pre-emptive regulation's force does not depend on express congressional authorization to displace state law[.]"). State law may be preempted when Congress intended federal law to occupy a field exclusively. *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492 (2012).

State law is also preempted when it conflicts with a federal statute so that it frustrates "[t]he statutorily authorized regulations of an agency" or stands as an obstacle to the accomplishment and execution of the federal agency's full purposes and objectives. *City of New York v. FCC*, 486 U.S. 57, 64, 108 S. Ct. 1637 (1988). State law may pose such an obstacle when it disturbs a balance the federal regulation has struck between "conflicting policies that were committed to the agency's care by the statute." *Id.* (citation omitted). That balance should not be

disturbed "unless it appears from the statute or its legislative history that the [balance] is not one that Congress would have sanctioned." *Id.* (citation omitted).

As with express preemption, because state "regulation can be ... effectively exerted through an award of damages" and because "[t]he obligation to pay compensation … is designed to be … a potent method of governing conduct and controlling policy," implied preemption extends to state-law claims, even when those claims do not expressly seek to change applicable standards or regulations. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637, 132 S. Ct. 1261 (2012) (first ellipsis and brackets in original; citation omitted) (Locomotive Inspection Act covers the entire field of regulating locomotive equipment to the exclusion of state regulation and "admits of no exception for state common-law duties and standards of care"). S*ee also Carrington v. City of Tacoma, Dep't of Pub. Utilities*, 276 F. Supp. 3d 1035, 1041 (W.D. Wash. 2017) (state-law tort claims, including the inverse condemnation claim, asserted against the operator of a hydroelectric dam were controlled exclusively by Federal Energy Regulatory Commission (FERC) license and thus preempted).

Here, Plaintiffs fault the Port for allowing the Airlines to land on and take off from SEA runways. Plaintiffs further blame the Port for inducing increased flight activity through the construction of a new runway and IAF at the Airport. But planes do not "wander about in the sky like vagrant clouds." *City of Burbank*,

411 U.S. at 633 (quoting *Nw. Airlines*, 322 U.S. at 303 (Jackson, J., concurring)).

They move "only by federal permission, subject to federal inspection, in the hands

of federally certified personnel and under an intricate system of federal

commands." *Id*. at 634 (citation omitted).  The moment an airplane "taxies onto a

runway," it is subject to "an elaborate and detailed system" of federal controls and

"its privileges, rights, and protection … [are] owe[d] to the Federal Government

alone and not to any state government." *NW Airlines*, 322 U.S. at 303 (Jackson, J.,

concurring).

This requires a uniform and exclusive system of federal regulation, and "one

unified system of flight rules," *United States v. Christensen*, 419 F.2d 1401, 1404

(9th Cir. 1969).  *See also Montalvo*, 508 F.3d at 473 ("The uniqueness of the

aviation industry … mandates the need for a centralized authority.").  To achieve

this uniformity, Congress vested the federal government with exclusive

sovereignty over the United States airspace.  It granted the FAA Administrator the

exclusive power to develop the plan and policy for the use of the nation's

navigable air to ensure its efficient use and aircraft safety.  49 U.S.C.

§ 40103(a)(1); *see Montalvo*, 508 F.3d at 472 (FAA is "the sole arbiter of air

safety"); *see also* 49 U.S.C. § 40103(a)(1)–(b)(1) (federal government has

"exclusive sovereignty of airspace of the United States" and is responsible for

"develop[ing] plans and policy ... necessary to ensure the safety of aircraft and the

efficient use" of that space); *id.* § 40103(b)(1)–(2) (FAA regulates protections of property and individuals on the ground and aircraft safety).

Congress also empowered the FAA to plan and develop the nation's public airports and carry out federal policies with respect to airport improvement. 49 U.S.C. § 47103; 14 C.F.R. § 151.3. Among other goals, Congress sought to provide for "airport construction and improvement projects that increase the capacity of facilities to accommodate passenger and cargo traffic ... to the maximum feasible extent so that safety and efficiency increase and delays decrease," 49 U.S.C. § 47101(a)(8), and to avoid "artificial restrictions on airport capacity," *id.* § 47101(a)(10). It directed the Secretary of Transportation to maintain the "plan for developing public-use airports in the United States, named 'the national plan of integrated airport systems'"; that plan

> shall include the kind and estimated cost of eligible airport development the Secretary of Transportation considers necessary to provide a safe, efficient, and integrated system of public-use airports adequate to anticipate and meet the needs of civil aeronautics, to meet the national defense requirements of the Secretary of Defense, and to meet identified needs of the United States Postal Service.

49 U.S.C. § 47103(a); 14 C.F.R. § 151.3(a).

The FAA's responsibilities also include reviewing and approving airport locations, design and construction, and the siting and direction of the airport runways, including any expansions. *See* U.S.C. tit. 49, subtitle VII, pts. B, D; 14

C.F.R. pt. 139 (Certification of Airports); FAA, Advisory Circular 150/5300-13B (Aug. 16, 2024) (Airport Design); FAA, Advisory Circular 150/5370-10H (Dec. 21, 2018) (Standard Specifications for Construction of Airports); *see also* U.S.C. tit. 49, subtitle VII, pt. A; FAA, Order No. JO 7400.2R (Feb. 20, 2025) (Procedures for Handling Airspace Matters) (establishing flight paths and the directions and heights that aircraft must follow as they land and take off at the nation's airports).

To maintain "a safe and efficient nationwide system of public-use airports that meets the present and future needs of civil aeronautics," the FAA provides grant funding to airport "sponsors"—the public agencies like the Port that own and operate airports.  49 U.S.C. §§ 47102(26), 47104(a).  These grant funds are awarded for the development of approved airport projects, like SEA's third runway, "only if the development complies with standards the Secretary prescribes or approves, including standards for site location, airport layout, site preparation, paving, lighting, and safety of approaches."  49 U.S.C. § 47105(b)(2)–(3);[17] *see also id.* §. 47104(a).

To receive federal grant funding, airport sponsors must give written "assurances" that they will abide by a variety of requirements including, but not

---

[17]  The Secretary may approve state standards for airport development only at non-primary public use airports, which do not include SEA.  49 U.S.C. §47105(c).

limited to, the duty to "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for [a] project" (Grant Assurance 1a); the duty to comply with standards for operation and maintenance (Grant Assurance 19); the duty to remain open as an airport for all types, kinds, and classes of aeronautical activities and make the airport "available for public use on reasonable conditions and without unjust discrimination" (Grant Assurance 22); and the duty to carry out airport improvement projects according to policies, standards, and specifications prescribed by the FAA (Grant Assurance 34). 49 U.S.C. §§ 47106, 47107; *see* 79 Fed. Reg. 18755 (Apr. 3, 2014) (Airport Improvement Program (AIP) Grant Assurances). The Secretary is authorized to approve grant funds only if the airport sponsor's assurances are "satisfactory to the Secretary," 49 U.S.C. § 47107(a), and ensures the sponsor's compliance, *id.* § 47107(g).[18]

---

[18] The Airlines' subject-matter jurisdiction argument (adopted by the Port) applies with equal force to FAA grants for airport expansion and related assurances. The FAA enforces compliance with grant assurances exclusively through a formal agency adjudicatory process. That process results in a final FAA order, reviewable exclusively in the courts of appeal. *See* 14 C.F.R. § 13.2; 14 C.F.R. pt. 16; *see also Town of Fairview v. U.S. Dep't of Transp.*, 201 F. Supp. 2d 64, 69–70 (D.D.C. 2002) (judicial review of the FAA's decision in part 16 proceedings is vested exclusively in the courts of appeals); 14 C.F.R. § 16.247 (a person may seek judicial review in the court of appeals pursuant to 49 U.S.C. § 46110); 49 U.S.C. §

The FAA also allows airport sponsors to fund airport development projects through passenger facility charges ("PFC"). 49 U.S.C. § 40117(b)(1). Congress vested PFC decision making exclusively in the FAA. "A State, political subdivision of a State, or authority of a State or political subdivision that is not the eligible agency *may not regulate or prohibit* the imposition or collection of a passenger facility charge or the use of the passenger facility revenue." *Id.* § 40117(b)(2) (emphasis added). The FAA may approve the PFC only for eligible airport projects that "[p]reserve or enhance capacity, safety, or security of the national air transportation system," reduce or mitigate noise, or "provide an opportunity for enhanced competition between or among air carriers." 49 U.S.C. § 40117(d)(2); 14 C.F.R. § 158.15. As with grant assurances, airport sponsors must provide PFC assurances requiring that they comply with all applicable statutes and regulations.[19]

After evaluating the associated environmental effects and confirming SEA's compliance with the applicable federal assurances, the FAA approved and funded the construction of the third runway including its north/south directional orientation that Plaintiffs complain about concluding that it would result in *de*

---

46110(c) (the courts of appeals have "exclusive jurisdiction" over an appeal from an order under this part).

[19] FAA, Airports PFC Program Assurances (2007), https://www.faa.gov/sites/faa.gov/files/airports/pfc/pfc-assurances.pdf.

*minimis* impacts to air quality. *See* ER-66–67 at ¶ 75.[20]  Similarly, after performing the requisite statutory balancing under 49 U.S.C. § 40117(d)(2), the FAA approved use of PFCs to construct the IAF[21] which Plaintiffs fault for increased flight activity at SEA (*see* ER-66 at ¶ 41, ER-77 at ¶ 93).  Plaintiffs challenged neither approval under 49 U.S.C. § 46110 and cannot do so now, collaterally, through state-law tort claims.

"[W]hen an agency administrator promulgates pervasive regulations pursuant to his Congressional authority," the court may "infer a preemptive intent unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption." *Montalvo*, 508 F.3d at 471.  There is no such indication here.  As previously shown, Congress entrusted the EPA and FAA with exclusive responsibility for promulgating and enforcing federal standards to regulate emissions from flying aircraft and their engines, 42 U.S.C. § 7573, and designated the FAA "the sole arbiter of air safety," *Montalvo*, 508 F.3d at 472.  It granted the FAA broad authority to issue comprehensive regulations and orders prescribing flight paths, altitudes, and runway approaches

---

[20] Record of Decision, *supra*, note 11.

[21] FAA, *Passenger Facility Charge Decisions – January 2017 through December 2017* at 46 of 81 (approval of SEA PFC application), www.faa.gov/sites/faa.gov/files/2023-01/PFC-Decisions-Online-2017.pdf.  *See also* 88 Fed. Reg. 7772.

that occupy the entire field of aircraft operations challenged in this case. The "pervasive nature of the scheme of federal regulation" and the "delicate balance between safety and efficiency" require a "uniform and exclusive system of federal regulation[s]" and leave no room for alternative "local controls" or state tort claims. *See City of Burbank*, 411 U.S. at 633, 638–39; *Kurns*, 565 U.S. at 637.

Similarly, in planning and developing the national network of public-use airports, in selecting grant recipients (and obtaining related grant assurances by airport sponsors) pursuant to the national Airport Improvement Program, and in approving the collection of PFCs for certain airport development projects, the FAA balances complex and potentially conflicting policy objectives that include safety, civil aviation needs, national defense, and the technical feasibility and cost of airport improvement projects. Because Plaintiffs' state-law tort claims would upset this delicate balance and jeopardize the FAA's objectives, they are preempted. As this Court explained in *Cohen v. Apple Inc.*, 46 F.4th 1012 (9th Cir. 2022):

> The reason why state law conflicts with federal law in these balancing situations is plain. When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations. A state-law standard that is more protective of one objective may result in a standard that is less protective of others.

*Id*. at 1029 (quoting *Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010)).

In dismissing as preempted state tort-law claims alleging that Apple's iPhones emitted dangerous levels of radiation, this Court reasoned that the 1934 Communications Act authorized the FCC "to balance the overlapping and potentially competing factors in setting safe and uniform limits for RF radiation from cell phones." *Id*. at 1030–31. Because the agency acted within its delegated authority when it performed this delicate balance and prescribed the acceptable levels of RF radiation, allowing state law, through tort claims, in essence, "to prescribe lower levels of RF radiation … would interfere with the nationwide uniformity of regulation . . . and would render the FCC's statutorily mandated balancing essentially meaningless." *Id.*

As in *Cohen*, Plaintiffs here did not plead that the Defendants exceeded any aircraft emissions standards, failed to follow any of the FAA regulations on flights paths, approaches or altitudes, or violated orders governing the federally planned and funded SEA infrastructure projects at issue in this case. And, as in *Cohen*, Plaintiffs concede that the same flight and airport operations, which they attack as "battery," "nuisance," "trespass" and a host of other state-law tort labels, are fully compliant with and/or mandated by federal law.

Accordingly, to find liability, a jury in this case would necessarily be asked to disregard the balance struck by the FAA in arriving at the standards Defendants must follow when constructing and operating airports and in operating flights to

and from SEA.  In other words, Plaintiffs rely on state-law tort claims to penalize the very activity the FAA has both permitted and/or required at SEA.  If such state tort claims were allowed to proceed, "[they] would 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" and for that reason are preempted.  *Id*. at 1031 (brackets and citation omitted) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73, 120 S. Ct. 2288 (2000)).

## IX.   CONCLUSION

For the reasons stated, the district court's order denying the Airlines' and the Port's motions to dismiss should be reversed and Plaintiffs' claims should be dismissed with prejudice.

DATED: August 11, 2025.                    STOEL RIVES LLP

*/s/Beth S. Ginsberg*
BETH S. GINSBERG
beth.ginsberg@stoel.com
RITA V. LATSINOVA
rita.latsinova@stoel.com
VANESSA SORIANO POWER
vanessa.power@stoel.com
MAREN R. NORTON
maren.norton@stoel.com
600 University Street, Suite 3600
Seattle, WA  98101
Telephone:  206.624.0900
Facsimile:  206.386.7500

*Attorneys for Appellant Port of Seattle*

150053346.2 0061365-00066

- 42 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  25-2830

I am the attorney or self-represented party.

**This brief contains** 9,701 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [              ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Beth S. Ginsberg  **Date** August 11, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                     *Rev. 12/01/22*